**In re NORTHPOINT COMMUNICATIONS GROUP, INC., SECURITIES LITIGATION**

**And Consolidated Cases.**

**This Document Relates
To: All Actions.**

**No. C01–01473 WHA.**

United States District Court,
N.D. California.

Dec. 21, 2001.

**ORDER: (1) GRANTING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS; AND (2) GRANTING PLAINTIFF LEAVE TO AMEND**

ALSUP, District Judge.

## INTRODUCTION

In this securities-fraud suit, the class-action complaint alleges that defendants made false and misleading statements concerning NorthPoint Communications

Group, Inc., between August and November 2000. The complaint contends that defendants, *inter alia,* overstated NorthPoint's revenues, earnings and subscribers, mischaracterized its accounting practices, and made misleading statements concerning a pending merger with Verizon Communications. NorthPoint was ultimately forced to revise its revenues. The Verizon merger fell through. NorthPoint's stock dropped, the company went bankrupt, and this suit ensued. Because NorthPoint is now in bankruptcy, this action is stayed as to it. The four individual defendants in this case, however—former CEO and President Elizabeth A. Fetter; former Chief Development Officer Herman Bluestein; former CFO Michael Glinsky; and former chairman Michael Malaga—have moved to dismiss the complaint. This order grants their motion, with leave to amend. It concludes that plaintiff has not met its burden of pleading facts giving rise to a "strong inference" of scienter.

## STATEMENT

NorthPoint Communications Group, Inc., was a provider of digital-subscriber-line (DSL) technology services. Through DSL technology, data can be transported at high speeds over traditional telephone wires. As a DSL "wholesaler," NorthPoint owned digital-communications equipment, which was installed in telephone-company offices. It also leased copper telephone lines to connect this equipment with end users. It marketed its DSL services to customers including telephone companies, Internet service providers (ISPs) and data-service providers (collectively, "network service providers"), who in turn would sell DSL services to end users. If a user signed up through one of NorthPoint's customers, NorthPoint would arrange for the installation of a DSL connection. NorthPoint would bill its customers for the installation (a one-time charge) as well as a monthly service fee for the use of the line.

The complaint attacks statements made between August and November 2000. These statements, primarily press releases, related to NorthPoint's revenues, subscriber lines, accounting policies, general business condition, and a planned merger with Verizon Communications. The principal charge is that defendants were knowingly or with deliberate recklessness reporting revenue NorthPoint was not reasonably assured of collecting and leading investors to believe that NorthPoint's merger with Verizon would still take place notwithstanding a possible abort by Verizon.

■ On August 7, 2000, NorthPoint agreed to combine its DSL business with that of Verizon's. This would have created a new company, Verizon Ventures I, Inc., to which Verizon was to contribute $800 million and certain DSL assets in exchange for majority ownership. The merger agreement, disclosed in a 8–K report filed August 14, 2000, allowed Verizon to back out if a "Material Adverse Effect" occurred upon NorthPoint's business (Def. Exh. G at 69). The agreement defined a Material Adverse Effect as (*id.* at 77):

[I]n the case of NorthPoint or Parent, any fact, event, change or effect having, or which will have, a material adverse effect on the business, operations, properties (including intangible properties), financial condition, assets or liabilities of NorthPoint or Parent, as the case may be, and its Subsidiaries taken as a whole, but shall not include facts, events, changes or effects that are generally applicable to (A) the data industry, (B) the United States economy or (C) the United States securities markets generally ... [1]

1. This order takes judicial notice of the merger agreement. Defendants requested judicial

The alleged class period would begin on August 8, 2000. On that day, NorthPoint announced the Verizon merger in a press release saying, among other things, that "[t]he merger combines the DSL networks, product suites, customers and personnel of NorthPoint and Verizon to create the preeminent broadband leader dedicated to accelerating broadband service innovation and choice nationwide" (Compl.¶ 32). NorthPoint also revealed its 2Q 2000 financial results in the same release. NorthPoint reported quarterly revenue of $24.4 million, and EBITDA-positive performance in four markets (*ibid*).

Relying on secret disclosures from eight "confidential witnesses" as well as other alleged facts, plaintiff claims that the second-quarter financial announcement was false and misleading. At that time, it is alleged, NorthPoint's customers were in such financial disarray and NorthPoint was so delinquent in providing services that much of the company's revenue was not reasonably assured of collectibility. In turn, the undisclosed matters purportedly posed a time bomb for the Verizon merger.

For similar reasons, the complaint also characterizes as misleading two press releases issued in September and a statement by defendant Liz Fetter, NorthPoint's CEO, in an October media article. All concerned the merger. The first press release, issued on September 6, 2000, quoted Fetter as saying, "Verizon's equity investment and debt financing will help NorthPoint maintain strong momentum as we move toward the close of our merger agreement," and, "We will use our greater financial strength to expand our network, scale our business and enhance the broadband customer experience. We look forward to the completion of the merger and to delivering its many benefits to American consumers and businesses" (Compl.¶ 34). The second release, issued September 20, 2000, said that "the deal accelerates NorthPoint's ability to scale and innovate, and makes NorthPoint a more formidable competitor against cable service providers" (Compl.¶ 36). The September 20 release also quoted Fetter as saying, "Our agreement with Verizon enables NorthPoint, already one of the most nationwide of all DSL service providers, to double its network and dramatically expands the availability of fast, reliable and affordable connections to the Internet" (*ibid*). Then, on October 20, 2000, a media article quoted Fetter as saying, "The road is littered with companies that have been unsuccessful at raising capital.... That's a worry off the table" (Compl.¶ 38).

\* \* \* \* \* \*

The main issue concerns 3Q 2000. In a press release issued on October 26, 2000, NorthPoint announced its 3Q 2000 financial results. Third-quarter revenues were reported to be $30.1 million, with an EBITDA loss of minus $79.2 million

notice of several documents, mostly SEC filings, in connection with their motion to dismiss. Plaintiff opposed consideration of much of this material. As plaintiff based its challenges to different documents on different grounds, this order will rule on defendants' request and plaintiff's objections thereto only as specific objections arise. Here, the merger agreement was expressly referenced in the complaint, though it was not said to be part of an SEC 8–K report. Defendants presented it as an 8–K filing in their request for judicial notice. Plaintiff objected on the grounds that the 8–K was not referenced in the complaint. Even to the extent that the 8–K is "outside" the complaint, review of it is still proper in the context of a Rule 12(b)(6) motion. In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (9th Cir.1991). *See also Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir.1998) (citing *Cortec*).

(Compl.¶ 40(c)). Significantly, the revenue excluded, for the first time, billings made to certain failing customers. The press release addressed this issue in the following manner (Compl.¶ 40(d)):

> NorthPoint has consistently applied what it believes is a conservative revenue recognition policy. During the past several months there has been a considerable change in the financing environment and it may be that a few of North-Point's customers will have difficulty raising the capital required to continue to grow their businesses.

> Given the consistent application of its revenue recognition policies and the financing challenges faced by a few of its customers, NorthPoint has chosen to recognize revenue for lines installed for these few customers only when the customers' financial outlook improves or when cash is received by NorthPoint.

The press release did not say how much revenue NorthPoint did not recognize in the results released October 26. In a conference call with industry analysts held on or about that day, however, it was revealed that the company excluded $2.8 million in revenue for the quarter (Compl.¶ 42). In other words, given the downward spiral of the Internet industry at that time, a revenue allowance of $2.8 million was taken to more realistically state revenue.

NorthPoint's October 26 press release also reported that the company had 87,300 installed lines as of September 30, 2000. It additionally included several statements pertaining to the Verizon merger, including quoting Fetter as saying, "We continue to be on track with our prior expectation of closing the transaction in the first half of 2001" (Compl.¶ 40(d)).

On or about the same day, NorthPoint officers held a conference call with industry analysts, as stated. Pursuant to the call, one analyst then reported that "the company has indicated that it is comforta-ble with revenue estimates for the fourth quarter and full year 2000" (Compl.¶ 42). A few weeks later, on November 13, 2000, Fetter was quoted in a NorthPoint press release as saying, "NorthPoint ... continues to be successful among the most formidable names in leading companies this century," and that the company was nearing the end of a "landmark year" (Compl.¶ 45). Then, on November 15, 2000, on a form NT–10–Q filed with the SEC, NorthPoint remarked on its "rapid growth since September 30, 1999" (Compl.¶ 52).

\* \* \* \* \* \*

On November 20, 2000, NorthPoint announced that it was revising its 3Q 2000 revenues. The press release said that NorthPoint had received "additional facts after the October 26, 2000, third-quarter press release that indicated some of its privately-held, consumer focused network service provider customers did not have sufficient long-term financial resources to assure the Company that they would be able to make timely payment for the Company's services" (Def.Exh. M). Revenues were revised downward from $30 million to $24 million. The release also quoted Fetter as saying, "These recent events confirm the validity of our decision to find a strategic partner like Verizon," and "We continue to be on track with our prior expectation of closing the Verizon transaction in the first half of 2001" (Compl.¶ 56).

Nine days later, Verizon backed out of the merger agreement, saying that a Material Adverse Effect had occurred. The proposed class period would close on this date, November 29, 2000. On that day, NorthPoint's shares traded at well less than $1, more than 90% less than the class period high. A month-and-a-half later, NorthPoint filed for bankruptcy. Its stock has since been delisted from the NASDAQ stock market. Substantially all of its assets have been sold to AT & T in a bank-

ruptcy sale. Its sole remaining assets of value are its subscriber-purchaser base and its lawsuit against Verizon, in which NorthPoint is seeking $1 billion.

## ANALYSIS

The complaint alleges that NorthPoint and several of its officers are liable for securities fraud. It alleges that purchasers of stock between August 8, 2000, and November 29, 2000, were injured by defendants' statements. The individual defendants have moved to dismiss the complaint pursuant to FRCP 12(b)(6) and 9(b). They argue, *inter alia*, that the complaint fails to satisfy the rigorous pleading standards imposed by the Private Securities Litigation Reform Act.

\* \* \* \* \* \*

■ Under FRCP 12(b)(6), a motion to dismiss should not be granted unless it appears beyond a doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). To state a claim for a violation of Rule 10b–5, a plaintiff must show: (1) a false or misleading statement or omission of material fact; (2) scienter; (3) reliance; and (4) resulting damages. *Paracor Fin. Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir.1996). When attacked pursuant to FRCP 12(b)(6), well-pled allegations in a complaint must be regarded as true. *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir.1983).

Securities-fraud suits, meanwhile, are subject to unique pleading requirements. In 1995, Congress enacted the PSLRA in order to curb what was perceived as a raft of abusive practices in securities-fraud litigation. In raising the bar for securities-fraud suits, the PSLRA toughened the already-stringent requirements for pleading fraud under FRCP 9(b). *Cf., In re Glen-Fed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir.1994). Under the PSLRA, to adequately allege securities fraud a complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement was misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint must state with particularity all facts upon which that belief is formed. 15 U.S.C. § 78u–4(b)(1).

■ Significantly, with respect to each act or omission alleged, the complaint must also state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. § 78u–4(b)(2). In the Ninth Circuit, the required state of mind is actual knowledge or "deliberate recklessness," or where the challenged statement is forward-looking, "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1); *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 979 (9th Cir.1999). "Deliberate recklessness," in a securities-fraud context, must reflect "some degree of intentional or conscious misconduct." *Id.* at 979.

■ A plaintiff may rely on circumstantial evidence to prove scienter, so long as that evidence meets the "strong inference" standard. *See Silicon Graphics*, 183 F.3d at 986; *In re Peoplesoft, Inc. Sec. Litig.*, No. C 99–00472 WHA, 2000 WL 1737936 at *3 (N.D.Cal. May 25, 2000). Such evidence might include "contemporaneous receipt of a report with information directly at odds with an alleged misrepresentation, the inference being that the conflicting data was timely read and remembered; and statements by witnesses that they told the actor the true facts before the false statement was made, the inference being that the actor heard and remembered the information, saw the discrepancy, and made the statement any-

way." *In re Peoplesoft, Inc. Sec. Litig.* at *3. In addition, upon the laying of a proper factual foundation it may be inferred that facts critical to a business's core operations or an important transaction are known to a company's key officers. *Ibid.* Such a foundation requires, at a minimum, a showing (with all requisite particularity) that the critical facts were actually known within the company.

\* \* \* \* \* \*

Defendants argue that the complaint should be dismissed outright as an impenetrable "puzzle-style" pleading. Although the complaint is most difficult to follow in places and assumes a shotgun / hodgepodge style in large part, this order declines to take such a drastic step. Instead, this order does its best to glean the complaint, focusing on those statements highlighted in bold therein as the main basis of plaintiff's claim. Even doing so, however, the Court agrees with defendants that the complaint is so structurally unsound with regard to one class of allegations that its specific claims cannot be salvaged, or even adequately discerned. This will be discussed later in the order.

### 1. Revenue.

The principal charge in the complaint is that defendants recorded and announced revenue for the second and third quarters of 2000 that they knew was not reasonably assured of collectibility or acted with deliberate recklessness in recording such insecure revenue.[2] This claim is leveled against both the announcement of

second-quarter earnings made on August 8, 2000, and the release of third-quarter earnings made on October 26, 2000. The more serious charge goes to the October 26 announcement. The discussion below, therefore, primarily focuses on whether the complaint adequately states a well-pled claim as to this announcement. It concludes that it does not, since plaintiff has failed to plead facts giving rise to a "strong inference" that defendants acted with, at a minimum, deliberate recklessness.

The revision of the third-quarter results shows that as originally announced, these results were incorrect.[3] With accounting fraud, however, the necessary scienter is in general not established merely by the publication of inaccurate accounting figures, or failure to follow generally accepted accounting principles. More is needed. *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1426 (9th Cir.1994).

In alleging scienter the complaint also relies heavily on the following: (1) statements issued by a competitor during the class period; (2) disclosures by eight confidential witnesses, all alleged to be NorthPoint employees during or throughout the class period; (3) the allegedly serious financial troubles of several NorthPoint customers, (4) certain marketing practices NorthPoint employed during the class period; (5) the fact, size and timing of the November 20 revision of the figures announced October 26; (6) stock sales made by three of the individual defendants during the class period; (7) NorthPoint's in-

2. The complaint's allegations that NorthPoint was recognizing revenue upon billing, rather than installation of a line, are (to put it mildly) speculative in the extreme and do not merit extended consideration.

3. No such revision has ever taken place as to the second-quarter results announced on August 8, 2000. The complaint alleges that these results were false too because, in con-

travention of SEC Staff Accounting Bulletin 101, the collectibility of revenue claimed therein was not reasonably assured and / or NorthPoint had not rendered the services for which revenue was credited. Therefore, the complaint alleges, the financial statements did not conform with GAAP and are presumed inaccurate. *See* 17 CFR § 210.4–01(a)(1).

terest in ensuring that the merger with Verizon went through; and (8) in-court allegations made by NorthPoint and Verizon in the context of a lawsuit arising out of Verizon's withdrawal from the merger agreement.

Significantly, the PSLRA was intended to put an end to cases of "fraud by hindsight." *In re Silicon Graphics,* 183 F.3d at 988. The complaint discusses steps NorthPoint *did* take to address customer delinquencies. Specifically, the complaint provides that NorthPoint increased its allowance for bad debt from less than $1 million to $1.43 million in 2Q 2000, before eventually increasing it to $12.86 million on November 20, 2000 (Compl.¶ 97).[4] In addition, NorthPoint did not recognize $2.8 million in revenue from financially unstable customers when it announced its third-quarter results on October 26, 2000 (Compl.¶ 40(a)). In light of these acknowledged measures, the decisive question in this case is whether defendants acted with, at a minimum, deliberate recklessness in not doing even more.

**(a) Covad.**

First, the complaint alleges that statements made by Covad, Inc., a NorthPoint competitor, constitute evidence of scienter by NorthPoint. In a 3Q 2000 earnings release, issued October 17, 2000, Covad announced that it would *not* recognize an undisclosed amount of revenue from some "slow-paying" ISPs in the third quarter (Compl.¶ 41(c)(ii)). In its 3Q 2000 report to the SEC, filed November 14, 2000, Covad specified that it did not recognize $11.4 million in revenue in its earlier announcement. Covad's report also said that subse-

quent to its October 17 release, FlashCom, a customer with whom Covad had worked out a payment plan, defaulted on said plan. In light of this late-developing event, Covad announced that it also would not recognize $7.5 million from FlashCom (Compl.¶ 41(c)(i)). The point alleged is that NorthPoint must have known of these reported events.

The timing of Covad's announcements shows that NorthPoint's main competitor came to similar realizations about its customers at almost exactly the same time as NorthPoint did. According to the complaint, Covad announced on October 17, 2000, that it was not recognizing revenue in 3Q 2000 from certain customers—not including FlashCom. On October 26, 2000, NorthPoint made substantially the same announcement, saying it would not recognize $2.8 million in revenue from certain unstable customers. Then, in its 10–Q for the third quarter, filed on November 14, 2000, Covad announced that it was restating its third-quarter revenue to subtract out $7.5 million attributable to FlashCom. The reason given was FlashCom's failure to meet its payment schedule. Six days later, NorthPoint made an almost identical announcement, also subtracting out revenues related to FlashCom. To hold up Covad as a model of what NorthPoint should have done is, more or less, to concede that NorthPoint did nothing wrong in the first place.

**(b) Confidential–Witness Disclosures.**

The confidential-witness statements, the backbone of the complaint, also shed little light on whether defendants acted with the necessary scienter. Even if accepted with-

---

**4.** The Court requested supplemental briefing on whether the record, or public records in this case, mentioned the bad-debt allowance as of October 26, 2000, referenced at hearing. Both parties made timely submissions. The document containing this figure, however, is inappropriate for notice at this stage. This order therefore attaches no weight to the supplemental submission, or to the October 26 bad-debt allowance figure discussed at hearing.

out caveat, at most they show that some steps were needed to account for uncollectibility. That was done to the tune of several million dollars. They do not show that defendants were deliberately reckless in not doing more.

The eight witnesses are identified as an "Account Manager" (CW1); a "Sales Consultant" (CW2); a "Regional Sales Operations Manager" (CW3); an "Account Support Director" (CW4); a "Business Development Director" (CW5); an "Account Support Manager" (CW6); a "Major Account Coordinator" (CW7); and an "Account Supervisor" (CW8). Significantly, the complaint does not discuss what the specific duties of these individuals were, or how they came to learn of the information they provide in the complaint. These witnesses mostly describe internal reports regarding, interactions with, and conversations about delinquent customers. The PSLRA requires that these allegations be pled with substantial specificity. When relying on the existence of internal reports, for example, a proper complaint must "contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Silicon Graphics*, 183 F.3d at 985.

The confidential-witness allegations going to defendants' alleged knowledge that revenues from two ISP customers (PSN and FlashCom) were not reasonably assured of collectibility are particularly key. These are the customers specifically alleged to be "involved in ... improper sales" elsewhere in the complaint (Compl.¶ 97). The allegations going to these customers (as well as all others), however, are vague, inconclusive and occasionally contradictory. Take, for example, the allegation that "PSN constantly stalled and disputed their bills and refused to pay" (Compl.¶ 33(b)(v)). But at what time did they refuse? Which bills did they refuse to pay? How does the witness know? This witness also appears to admit that PSN paid at least some of its bills, since "NorthPoint employees went to PSN's headquarters in Phoenix, Arizona around August of 2000 to try to get them to pay *their bills that were overdue*" (emphasis added) (*ibid*). The point is clarified only slightly by another allegation attributed to the witness, which confusingly provides that "PSN was delinquent throughout 2000" and "PSN began to become seriously delinquent on their bills to NorthPoint from May or June 2000" (*ibid*). What is the difference between "delinquent" and "seriously delinquent"? Did this difference bear any weight within NorthPoint? The witness never says. These alleged facts lead toward a sense of confusion more than toward a strong inference of scienter.

The confidential-witness disclosures are only slightly more clear where FlashCom is concerned. One confidential witness says, "There were also phone calls between defendant Glinsky and FlashCom's CEO regarding FlashCom's serious delinquency" (Compl.¶ 33(b)(ix)). But the complaint never says when these phone calls occurred, or what was specifically discussed. Likewise, another witness says, "There were frequent conference calls between NorthPoint and FlashCom where the delinquent payments were discussed," without providing any detail as to when these calls were made or who were involved in them (Compl.¶ 33(b)(vii)).

According to one confidential witness, an account supervisor for NorthPoint, FlashCom owed NorthPoint approximately $5 million and was more than 120 days delinquent on payments as of March 2000 (Compl.¶ 33(b)(ix)). The witness does not say that FlashCom was 120 days delinquent as to all $5 million, or just a portion thereof. At that point, "a meeting tran-

spired where an agreement was made for a payment plan" in which FlashCom would pay $500,000 immediately, and then pay an amount against the balance each month until the receivable was paid off (*ibid*). According to the witness, FlashCom paid the initial $500,000 per the March agreement, but then only made "one or two" additional small payments against the balance owed for the rest of the year (*ibid*). The complaint never says who attended the meeting, what the payments were, when they were made, or what representations FlashCom made to NorthPoint in working out the payment plan. These facts could be of manifest importance in determining the adequacy of NorthPoint's response to FlashCom's alleged delinquency.

Another secret witness reports that in October 2000, he / she "received an e-mail that defendant Liz Fetter also received" (Compl.¶ 33(b)(v)). That e-mail "detailed which customers were past due and how must they owed" (*ibid*). The complaint is not clear as to what the e-mail said, when it was received (before or after the October 26 announcement), or how the confidential witness knew Fetter received it. The alleged message may have said (the complaint is unclear) that FlashCom owed approximately $4 million, and two other customers (Zyan and PSN) owed $2 to $2.5 million cach. The allegation concerning the e-mail does not, however, provide how late any of these customers were in paying their bills at that time. It is plain from the face of the complaint that FlashCom, at least, had made some payments since March 2000. Even assuming that the e-mail exists and was received by Fetter before the October 26 date (three significant leaps of faith, given the lack of detail the complaint provides about the message), it does not give rise to a strong inference that Fetter (or anyone else) was deliberately reckless in not recognizing as revenue a greater amount than $2.8 million.

The foregoing are among the more specific allegations attributed to the confidential witnesses.

Other assertions are more vague; such as "NorthPoint had serious difficulties in the installation of DSL lines" (Compl.¶ 33(b)(viii)) and "NorthPoint was having serious difficulty collecting funds from its ISP customers" (Compl.¶ 33(b)(ii)). Still others speak to business problems only tangentially related to the issue of whether NorthPoint falsely reported revenues. Some just emphasize that unnamed ISP customers were behind in paying their bills, without addressing whether NorthPoint accounted for these customers in the actions it took on October 26, 2000. Finally, none of the allegations ever refer to defendants Bluestein and Malaga. As to them, the complaint relies on its boilerplate assertion that knowledge can be attributed to these executives "[b]ecause of their positions and access to material non-public information available to them and not to the public" (Compl.¶ 19).

All in all, the gaps within and across the confidential-witness disclosures are just too great. Even taken together with all inferences drawn in their favor (and added to details in NorthPoint's public filings concerning lengthening delays in ISP customer payments) at most they show that NorthPoint and its ISP customers made some bad business decisions and had some operational shortfalls, which in turn led NorthPoint to allow for more uncollectibility as the year progressed. The allegations do not raise a "strong inference" that defendants acted with at least deliberate recklessness in failing to do more sooner.

**(c) Customer Risks.**

The complaint also makes allegations concerning the "serious financial troubles" of FlashCom and several of NorthPoint's

other customers. These provisions contend, *inter alia*, that NorthPoint propped failing customers up with market development funds. Overall, they fail to demonstrate anything more than the (in hindsight) overly optimistic mentality that pervaded the "dot.com" economy in 2000. This section of the complaint is often repetitive, with part of the "serious financial trouble" of a customer consisting of alleged secret evidence that the customer was delinquent in paying its NorthPoint bills, or that NorthPoint wasn't installing its lines on time.

Where the allegations are fresh, they too fail to raise a strong inference of scienter. For instance, the complaint emphasizes that FlashCom never had its initial public offering. In a registration statement it issued for the IPO on May 12, 2000, FlashCom had said, "we believe that the net proceeds from this offering, together with our existing cash balances, will be sufficient to fund our operating losses, capital expenditures, lease payments and working capital requirements for at least the next 12 months" (Compl.¶ 71). When the IPO fizzled, the complaint alleges that the registration statement should have put the world on notice that FlashCom could not pay. This reading benefits greatly from hindsight, and knowledge therefrom of the burst in the Internet bubble. Significantly, the complaint does not allege facts showing that NorthPoint knew of Flash-Com's alleged internal problems, outside of its delinquency in paying its NorthPoint bills.

Challenged too is NorthPoint's alleged practice of providing FlashCom with market development funds. At the time, such promotional funds may have seemed like a good idea. They proved to be wasted on

FlashCom. That, however, does not mean that financials were reported fraudulently.

**(d) Insider Stock Sales.**

 The individual defendants' stock sales here are not particularly powerful evidence of fraud. Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter. Insider trading is suspicious, however, only when it is "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics Sec. Litig.*, 183 F.3d at 986, quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989). Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history. *Id.*

Here, the stock sales made by Bluestein, Fetter and Malaga are not particularly suspicious. Malaga sold 200,000 NorthPoint shares during the class period; Fetter, 100,000; Bluestein, 30,000; and Glinsky, none. In sum, defendants sold 330,000 shares for a total of $3,805,919 (Compl.¶ 113). SEC filings referenced in but not attached to the complaint establish that these sales represented 2.8 percent of Malaga's total holdings and 9.5 percent of Bluestein's holdings (Def.Exh. I, J, K).[5] It is true that Malaga and Fetter sold shares on three of the same days (August 29–31, 2000). Perfectly synchronized sales can contribute toward an inference of scienter. But Malaga had begun to sell his shares several days earlier (August 25), weakening this inference. Finally, defendants' sales are not significantly out of

---

**5.** Judicial notice of these totals, derived from SEC filings, is proper. *In re Silicon Graphics,* 183 F.3d at 986. The Court was not able to reconstruct the percentage of shares sold by defendant Fetter from the filings provided by defendants.

line with their past sales history. Malaga appears to have sold more shares in the class period than in prior equivalent periods. But as discussed before, he sold less than ten percent of his overall holdings during the class period. Fetter and Bluestein, meanwhile, both matched their class-period sales in the month of November 1999 alone. The class period sales, altogether, contribute little if at all to an inference of scienter.

### (e) Timing and Size of the Financial Revision.

The complaint also points to the timing and proportion of the November 20 revision of the financial figures as proof of scienter. First, the timing of the revision is seen as suspicious because it was made so close to challenged statements issued on November 13 and 15. But as discussed below, the November 13 and 15 statements were so vague that they probably could have been made (and not be actionable) even after the November 20 revision. The size of the one-time revision was indeed large but that alone does not raise a strong inference that the October 26 revenue allowance was set too low with deliberate recklessness.

In the decision plaintiff relies on, *Gelfer v. Pegasystems, Inc.*, 96 F.Supp.2d 10 (D.Mass.2000), the defendants restated revenue on at least four different occasions. Three of these restatements occurred after improper accounting methods were brought to light by the resignation of the firm's accountants. *Id.* at 16. *Gelfer* had little difficulty finding recklessness on those facts. Here, the situation is different. NorthPoint's revenues were revised only once. Although it was a substantial revision, given its context and singular na-

ture it does not produce the same inference of deliberate misconduct as that involved in *Gelfer*.

### (f) Verizon.

To be sure, preserving the Verizon merger provided an incentive to feign success. There is no fact pled, however, indicating that this incentive translated into fraud. The complaint never provides any real detail as to what Verizon said it would or would not consider a Material Adverse Effect. In fact, the merger agreement's "carve-out" for problems that were generally applicable to the data industry would seem to have afforded NorthPoint the security to issue financial announcements fully responsive to ISP customer delinquencies, particularly in light of Covad's similar problems with its customers.[6]

### (g) Admissions by NorthPoint.

The "silver bullet" announced by plaintiff's counsel at the hearing has proven less lethal. After the merger collapsed, NorthPoint sued Verizon. In that complaint (excerpted at ¶ 33(f) of the complaint in this case), NorthPoint alleged that "in connection with its execution of the Merger Agreement, representatives of Verizon also represented that events similar to those which Verizon has raised as the purported basis for terminating the Merger Agreement would not constitute a Material Adverse Effect." Plaintiff contends that this statement is an outright admission that NorthPoint knew, as of August 2000, that something on the order of six million dollars in revenue revision was likely. This is not, however, the most plausible reading. Rather it refers to the "carve-out," *i.e.*, to representations made regard-

---

**6.** As previously and subsequently discussed, the merger agreement excluded from the definition of a Material Adverse Effect "facts, events, changes or effects that are generally

applicable to (A) the data industry, (B) the United States economy or (C) the United States securities markets generally" (Def. Exh. G at 77).

ing the clause in the agreement excluding from the definition of a "Material Adverse Effect" those "facts, events, changes or effects that are generally applicable to (A) the data industry, (B) the United States economy or (C) the United States securities markets generally." There is no silver bullet.

Finally, the complaint also characterizes as an admission NorthPoint's statement in its 2Q 2000 10–Q that "implementation of SAB 101 has been delayed by the Securities and Exchange Commission until the fourth quarter of the fiscal year.... Accordingly, the Company will continue to evaluate the impact of SAB 101 on its financial statements and related disclosures" (Compl.¶ 33(a)(vi)(a)). The complaint portrays this as an admission that defendants knew they were not following GAAP. This is a strained reading of this statement. NorthPoint could have been adhering to GAAP while also evaluating whether SAB 101 provided useful additional direction. The purpose of SAB 101 was to respond to certain questions regarding revenue recognition. It offered specific examples going to how and when revenue should be recognized. NorthPoint's statement that it would "evaluate the impact" of these lessons falls well short of an outright admission that it had previously not complied with GAAP.

* * * * * *

Those are plaintiff's allegations. Taken together, they are consistent with an honest effort by NorthPoint to address customer delinquencies by increasing the allowance for bad debt and revenue exclusion. With hindsight, plaintiff says NorthPoint should have set aside more. NorthPoint erred, no doubt, but no strong inference of actual knowledge of falsity or deliberate recklessness exists. As *Ronconi* put it, "The statement, 'the storm is passing and it will be sunny tomorrow,' when it in fact continues to

snow the next day, may be bad forecasting, but it is not necessarily a lie." *Id.* at 433. The record shows no more than a failure by defendants to fully anticipate the difficult times that would befall the Internet industry in late 2000. On this record, the Court cannot conclude that their lack of foresight is actionable as securities fraud, even as to the October 26 financial statements (including the related allegation in the October 26 release that NorthPoint adhered to "conservative" accounting principles). And since the evidence proffered is in many respects cumulative over time, the attack on the second-quarter financial announcement, made months before, also fails.

## 2. Installed Lines.

The complaint also characterizes as false and / or misleading statements made in the August 8 and October 26 releases regarding NorthPoint's total number of installed lines. In the August 8 release, NorthPoint said that it had 62,000 "subscribers"; on October 26, that it had 87,300 "installed" lines. On November 20, 2000, NorthPoint announced that 26,700 of the lines announced on October 26 were associated with delinquent customers. All this is admitted. The complaint never takes the necessary next step of alleging any facts showing that either of these figures was in any way false. The confidential witnesses allege only that NorthPoint had "serious problems" installing DSL lines (Compl.¶ 33(b)(i)). The existence of such problems does not necessarily make the subscriber figures false, however. The complaint never states that the particular lines noted in the August 8 and October 26 releases were never installed. The November 20 release was just an admission that installed lines were associated with delinquent customers, not that the lines recognized on October 26 had not been installed.

### 3. Verizon.

 The next major category of allegedly fraudulent statements challenged in the complaint concerns NorthPoint's planned merger with Verizon. These statements anticipated the Verizon merger and spoke to its perceived benefits. Plaintiff says they were made with deliberate recklessness because the Verizon merger was known to be doomed. (Above the merger was relevant to show possible incentive to overstate revenue; here it is relevant to whether statements made about the merger itself were misleading.) As with the allegations concerning revenues and earnings, however, plaintiff has failed to plead facts giving rise to a strong inference of deliberate recklessness as to these statements.

First, the complaint indiscriminately carries on with almost ten pages' worth of material that NorthPoint allegedly should have disclosed. This information, however, includes future developments that NorthPoint obviously could not have disclosed at the time the allegedly misleading statements were made (between August 8 and November 20): *e.g.,* the fact that Verizon would later back out of the agreement; the fact that NorthPoint would then sue Verizon, *etc.* The complaint also appears to assert that NorthPoint should have revealed "facts" like "plaintiffs believe that NorthPoint could no longer hide its revenue recognition," a comment in paragraph 33(c) of the complaint. The reader is left to hunt for those statements NorthPoint really should have made in order to make the statements pertaining to the merger not misleading. Pains have been taken to fully grasp the complaint, notwithstanding defendants' blanket charge that it is a puzzle-style pleading. The charges related to Verizon are one area in which defendants' argument has real merit. The presentation of these allegations is contrary to both the PSLRA and the general standards for pleading fraud.

In addition, the complaint never alleges facts giving rise to a "strong inference" of scienter as to these statements. As acknowledged in the complaint, the merger agreement between NorthPoint and Verizon only *"allowed"* Verizon to terminate the contemplated deal if NorthPoint suffered a material adverse effect (Compl.¶ 26). There is absolutely nothing in the complaint to the effect that NorthPoint knew or deliberately ignored signs that Verizon would abort. Instead of alleging concrete facts, such as communications between Verizon and NorthPoint on this matter, the complaint pursues an extended chain of inferences: The defendants *must have* known or suspected that Verizon *would* regard the revenue revision or customer delinquencies as a material adverse effect, and that Verizon *would,* therefore, cancel the merger—notwithstanding the merger agreement's "carve-out" for matters generally applicable to the data industry, and Verizon's failure to give NorthPoint any specific warnings. The PSLRA clearly establishes a preference for facts over such inferential leaps. There is just no evidence that the decision not to engage in mealy-mouthed speculation concerning the merger was a deliberate or reckless omission, even taking all of plaintiff's allegations into account.

### 4. "Formidable Names"; "Rapid Growth"

 Several other statements challenged by the complaint are also not actionable, for various reasons. First, vague and amorphous statements do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery material when making an investment decision. *Raab v. General Physics Corp.,* 4 F.3d 286, 288–90 (4th Cir.1990); *Wenger*

*v. Lumisys, Inc.,* 2 F.Supp.2d 1231, 1246 (N.D.Cal.1998). The challenged statements in the November 13 press release clearly fall under this rule. No reasonable investor would rush out to buy NorthPoint stock upon reading Fetter's comment that NorthPoint "continues to be successful among the most formidable names in leading companies this century," and that the company was nearing the end of a "landmark year."

■ Next, the complaint fails to show how certain challenged statements were false. On October 26, 2000, after a conference call with NorthPoint officers an analyst report provided that "the company has indicated that it is comfortable with revenue estimates for the fourth quarter and full year 2000" (Compl.¶ 42). The complaint never goes on to say what those estimates were, nor that they were not met. On November 15, 2000, NorthPoint said that it had "experienced rapid growth since September 30, 1999" (Compl.¶ 52). With or without its revenues restated, this was true; the company *had* experienced rapid growth over the past year. The consolidated complaint says that these statements were nevertheless actionable because they gave investors a "misleading impression" of corporate health. Failure to caveat bland statements such as these, however, with a company's every trouble is a weak basis for a fraud claim. *Cf., Ronconi,* 253 F.3d at 430. This is particularly true where, as here, NorthPoint had already announced that it was not recognizing revenue from certain customers. *See Wenger,* 2 F.Supp.2d at 1246 (a company cannot be held liable for failing to educate the public about publicly-known facts). The undisclosed material only went to the magnitude of the issue, and not whether it existed at all.

## CONCLUSION

For the reasons stated above, this order finds that the consolidated complaint fails

meet the PSLRA-*Silicon Graphics* standard for pleading scienter as to any statement. The complaint is **DISMISSED.** Plaintiff's request for leave to amend is **GRANTED.** Any amended consolidated complaint must be filed no later than **January 24, 2002.** No supplemental discovery will occur before a hearing on a motion to dismiss the amended complaint, if any.

**IT IS SO ORDERED.**