**In re METAWAVE COMMUNI-CATIONS CORP. SECURI-TIES LITIGATION**

**This Document Relates to All Actions**

**No. C02–625Z.**

United States District Court,
W.D. Washington,
At Seattle.

June 20, 2003.

Dennis J. Herman, Williams Youle &
Koenigs, Denver, CO, Dennis J. Herman,

Milberg Weiss Bershad Hynes & Lerach LLP, Eli R. Greenstein, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, Erin K. Flory, Hagens Berman LLP, Seattle, WA, Ira M. Press, Kirby McInerney & Squire, Jeffrey H. Squire, Kirby McInerney & Squire, Pamela E Kulsrud, Kirby McInerney & Squire, New York City, Randi D. Bandman, Milberg Weiss Bershad Hynes & Lerach LLP, San Francisco, CA, Steve W. Berman, Hagens Berman LLP, Seattle, WA, William S. Lerach, Milberg Weiss Bershad Hynes & Lerach, San Diego, CA, for Plaintiffs.

Barry M. Kaplan, Perkins Coie, C. N. Coby Cohen, Perkins Coie, Douglas W. Greene, Perkins Coie, Ronald L. Berenstain, Perkins Coie, Bradley Lloyd Fisher, Davis Wright Tremaine LLP, Seattle, WA, David B. Bayless, Morrison & Foerster, Sandra Hanna, Morrison & Foerster, Tammy Albarran, Morrison & Foerster, San Francisco, CA, for Defendants.

## ORDER

ZILLY, District Judge.

This matter comes before the Court on Defendants Hunsberger and Fuhlendorf's motion to dismiss Plaintiffs' consolidated complaint, docket no. 34, and Defendant Liang's motion to dismiss the consolidated complaint, docket no. 37. On May 29, 2003, the Court heard oral argument on these motions to dismiss, and on Defendants Hunsberger and Fuhlendorf's request for judicial notice, docket no. 35.[1]

## BACKGROUND

Plaintiffs bring this securities fraud class action on behalf of purchasers of the publicly traded securities of Defendant Metawave Communications Corp. ("Metawave") during the period from April 24, 2001 to March 14, 2002 (the "Class Period"). Plaintiffs bring this action against Metawave[2] and three of its officers Chairman of the Board and Chief Executive Officer ("CEO") Robert Hunsberger; former Chief Financial Officer ("CFO") Stuart Fuhlendorf, and former President of World Trade and Vice President for Worldwide operations Victor Liang (collectively, the "Individual Defendants"). The Consolidated Class Action Complaint ("CCAC"), docket no. 28, alleges that Metawave and the Individual Defendants made material misrepresentations regarding three subjects: (1) the quality of Metawave's SpotLight GSM product, which was a "smart antenna" designed to increase the capacity and quality of cellular phone networks, and the demand for the product in China, (2) Metawave's recognition of revenues from SpotLight GSM sales, and (3) Metawave's accounting for inventory.

Metawave developed, manufactured, marketed, and sold "smart antenna" systems under the SpotLight brand name. Smart antennas are products designed to boost the capacity of existing wireless networks to accommodate additional users without building new cell sites. CCAC ¶¶ 2, 40. In 1998, Metawave began to

---

1. At the hearing, the Court granted in part and denied in part Defendants Hunsberger and Fuhlendorf's request for judicial notice, docket no. 35. The Court held that under the doctrine of incorporation by reference, *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002), and FED R. EVID. 201(b), it would consider the documents submitted by Hunsberger and Fuhlendorf for the purpose

of determining the contents of the documents, but not for the truth of the statements contained therein because Plaintiffs dispute the truth of the documents submitted. 15 U.S.C. § 78u-5(e).

2. Metawave filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, on January 31, 2003. This action is stayed as to Metawave.

develop a version of its SpotLight GSM product that was compatible with Global System for Mobile Communications ("GSM") wireless standards. *Id.* ¶ 41. Metawave initially focused its search for a viable market for the SpotLight GSM product on North America. *Id.* ¶ 44. However, by 2001, Metawave's domestic sales for the SpotLight GSM product were lagging, and Metawave began to expand the market for its product in Europe and Asia. *Id.* ¶¶ 45–46. Metawave hired Defendant Liang in September 1998 to lead the development of and to help launch the SpotLight GSM product in the Asian wireless market. *Id.* ¶ 46. As part of its strategy for selling the SpotLight GSM product, Metawave reported that it had entered into distribution agreements with distribution companies in Asia. Request for Judicial Notice ("RJN"), docket no. 35, 1:15–16. These distributors would sell the products to cellular network operators who were sometimes called "end users."

Metawave reported that it first shipped SpotLight GSM products to distributors in China and Taiwan in the fourth quarter of 2000, generating sales revenue of approximately $1.06 million. RJN 1:14, 1:86. Metawave reported that it shipped these products to China valued at approximately $1.558 million in the first quarter of 2001, $5.587 million in the third quarter of 2001, and $2.5 million in the fourth quarter of 2001. RJN 3:179, 5:208, 16:265.[3] By December 2001, Metawave had received roughly $2.245 million in cash payments from its Asian distributors. CCAC ¶ 15.

Plaintiffs allege that statements made in Metawave's Form 10–Q filings with the Securities and Exchange Commission ("SEC") for the first and third quarters of 2001, conversations with analysts in April 2001, July 2001, and January 2002,[4] and eight press releases were false or misleading regarding demand for the SpotLight GSM product in China, revenue recognition, and inventory accounting. *Id.* ¶¶ 60–62, 98–103, 118–20, 138, 145, 148. Specifically, Plaintiffs allege that on April 24, 2001, Metawave falsely stated that "the results in this quarter were caused by a deferral of orders and not an overall reduction in demand for our products," and that during the first quarter of 2001 there was "an increase in demand for our GSM products in Asia." RJN 9:249. Plaintiffs allege that on May 15, 2001, Metawave falsely stated that "we've been seeing increased demand for our SpotLight GSM product in the Asian market," and that "given this demand, we anticipate that we will make up this shortfall during the third and fourth quarters of this year." RJN 10:251. Plaintiffs allege that on May 29, 2001, Metawave falsely announced the "successful completion of its GSM ... smart antenna system field trial." RJN 11:252. Plaintiffs allege that on July 24, 2001, Metawave falsely reported that it was "pleased with our progress during the quarter, particularly ... the new GSM orders from Asia," and that "[t]hese GSM orders indicate increasing demand and acceptance for our recently introduced GSM smart antennas. Because of this, we anticipate improved results in the second half of the year." RJN 12:253 Plaintiffs allege that in Metawave's October 2, 2001 and October 23, 2001 press releases, Defendant Hunsberger falsely assured investors that demand for GSM products had not weakened by attributing disappointing revenue results to "parts shortages and manufacturing test issues." RJN 13:257, 14:259.

---

**3.** Metawave did not report the shipment of any GSM products to China in the second quarter of 2001. RJN 4:192–93.

**4.** Plaintiffs did not specifically identify which statements in the conversations with analysts were allegedly false or misleading.

Plaintiffs allege that on January 8, 2002, Metawave falsely announced the results of its "successful GSM ... smart antenna cluster deployment" in Guangzhou, China. RJN 15:263. Plaintiffs allege that the January 8, 2002 press release included false or misleading quotations from one of Metawave's end users who stated that "[w]ireless demand is explosive in the China market," and that "Metawave's smart antennas will enable us to meet these objectives and significantly improve our quality of service." *Id.* Plaintiffs also allege that the January 8, 2002 press release contained a false statement by Victor Liang who stated that "[o]ur smart antennas are ideal solutions for operators." *Id.* Plaintiffs allege that the January 29, 2002 press release was false and misleading because although Metawave announced its decision to change its revenue recognition policy after analyzing its "distributor arrangements," Metawave did not reveal that its "distributor arrangements" gave distributors a right to return GSM products, and that defective GSM products were shipped on a consignment basis. RJN 16:265.

Plaintiffs allege that Defendants' statements were false, relying on confidential witnesses who were senior managers or engineers responsible for developing the SpotLight GSM product. Plaintiffs claim that GSM field tests in China failed, and that there were no successful deployments during the Class Period. CCAC ¶¶ 64, 67, 69, 95, 106, 109, 111. Plaintiffs also claim that Metawave had no customers for the GSM product because the product did not function properly. *Id.* ¶¶ 93–95, 143. Plaintiffs allege that Metawave established a distribution scheme to ship unsold products to Asian distributors and to sell products on consignment. Plaintiffs claim that this scheme created the illusion of increasing demand and sales for the GSM product in the Asian market. Plaintiffs allege that

Metawave continued to order shipments of defective products to China although there were already many unsold units in warehouses in China. *Id.* ¶¶ 106, 108, 110, 112, 131. Plaintiffs allege that the Individual Defendants knew of the shortcomings of the GSM product because they attended regularly scheduled meetings concerning the GSM product. These meetings would include discussions of the actual number of GSM products being built, shipped to distributors, sold to actual customers, and deployed. *Id.* ¶¶ 74–79, 128, 135. Plaintiffs assert that despite the shortcomings of the GSM product and its limited demand, Metawave made false and misleading statements about the demand for its product in China. *Id.* ¶¶ 59–63, 98–101, 118–20, 138, 145–47.

Plaintiffs allege that Metawave entered into agreements with distributors that allowed them to return the unsold product. Plaintiffs claim that Defendant Liang had actual knowledge of the improper sales to Chinese distributors because he negotiated the agreements. *Id.* ¶ 80. Thus, Plaintiffs contend that no real sales occurred in Asia, but that Metawave was consigning its defective product to Asian distributors. *Id.* ¶¶ 66, 106, 116, 122, 126, 146. Plaintiffs allege that despite these "consignments," Metawave continued to report revenue. *Id.* ¶¶ 76–77. Plaintiffs claim that the Individual Defendants had knowledge of the inaccurate sales in China because they received monthly "Redbooks" before filing Metawave's financial statements. *Id.* ¶¶ 80, 129. The Redbooks contained current financial statements, balances, reserves, and any changes in Metawave's financial position. *Id.* Plaintiffs allege that the Individual Defendants repeatedly caused Metawave to make accounting adjustments between the time of the distribution of the Redbooks and the time of Metawave's SEC filings to generate favorable financial results. *Id.* Plaintiffs also

allege that Metawave manipulated its accounting by recording obsolete and non-existent inventory. *Id.* ¶ 84.

In March 2002, as part of a larger restructuring of its business, Metawave decided to terminate its SpotLight GSM product line. Metawave announced Defendant Liang's resignation on March 4, 2002. RJN 17:270. In a press release issued on March 14, 2002, Metawave announced that because of "insufficient customer demand for its SpotLight GSM product," it was discontinuing its GSM product line. RJN 18:271. Metawave also announced that Defendant Fuhlendorf would be leaving the company. *Id.* Metawave further disclosed in the press release that it had identified certain unauthorized commitments that were made to its customers in Asia, and therefore anticipated restating approximately $5 to 7 million of revenue recognized in the first and third quarters of 2001. *Id.*

After the March 14, 2002 press release, Metawave's stock fell over 70%, falling below $1 per share. CCAC ¶ 12. On March 15, 2002, 26 million shares of Metawave stock changed hands as its stock price dropped from the previous day's closing price of $1.10 to close at only 32¢ per share. *Id.* ¶ 159.

In April 2002, Metawave issued its annual report for the year ending December 31, 2001, which confirmed the restatement of $7.1 million in revenues from GSM sales recognized in the first and third quarters of 2001. RJN 2:162. The annual report also confirmed that there was not enough customer demand to continue with the SpotLight GSM product. RJN 2:119. The report stated that Metawave would record charges totaling $23 million in connection with the restructuring of operations caused by the discontinuation of the GSM product line, including $18.1 million for the write-off of inventory and assets associated with that product. *Id.* The report also identified a category of current liabilities as "Deposits from Asian Companies" in the amount of $2.245 million as of December 31, 2001, which reflected cash received from Metawave's Asian distributors that could not be booked as revenue. RJN 2:150.

Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, which implements Section 10(b) of the 1934 Act.[5] Plaintiffs also allege that Defendants are liable under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), which provides that controlling persons shall be liable for violations of the 1934 Act committed by another person within their control.

**DISCUSSION**

**I. Defendants Hunsberger and Fuhlendorf's Motion to Dismiss**

A complaint should not be dismissed for failure to state a claim unless it appears

---

5. Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of . . . any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 provides that it is unlawful to use any facility of the national securities exchange "[t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(a). Rule 10b–5 further states that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* § 240.10b–5(b).

beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 931 (9th Cir.2003). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *America West*, 320 F.3d at 931, *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999). A fact is material under Section 10(b) and Rule 10b–5 if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

■ In a securities fraud case, a heightened pleading standard applies for a motion to dismiss under FED. R. CIV. P. 12(b)(6). FED. R. CIV. P. 9(b) generally requires that pleadings of fraud must state the circumstances constituting fraud with particularity. The Private Securities Litigation Reform Act of 1995 ("PSLRA") amended the 1934 Act, and imposed heightened pleading requirements for private securities fraud claims. *Silicon Graphics*, 183 F.3d at 973. The PSLRA requires that a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Plaintiffs must "state with particularity facts giving rise to a strong infer-

ence that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). Plaintiffs "must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. The PSLRA provides that a complaint must be dismissed if a plaintiff fails to plead the alleged misleading statements or scienter with particularity. 15 U.S.C. § 78u–4(b)(3)(A). The Ninth Circuit has merged the PSLRA's dual pleading requirements for scienter and falsity into "a single inquiry" because falsity and scienter are "generally strongly inferred from the same set of facts." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001). "In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), [the Court] must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements." *Id.* (internal quotation marks and citations omitted).

■ In a securities fraud case, the Ninth Circuit requires that a defendant's state of mind be one of "deliberate or conscious recklessness." *America West*, 320 F.3d at 931 (quoting *Silicon Graphics*, 183 F.3d at 979). Mere motive and opportunity are not enough. *Silicon Graphics*, 183 F.3d at 979. The court must look at all the circumstances in determining whether there is a strong inference of scienter. *Id.* at 984–87. Particularized facts and corroborating details should support each allegation. *Id.* at 985. Aside from the individual allegations, the Court considers "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Lipton v. Pa-*

*thogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir.2002).

There is some tension between the inferences that must be made in considering a motion to dismiss under FED. R. CIV. P. 12(b)(6) and the PSLRA's heightened pleading standard. On one hand, the Court must accept all allegations of material fact as true and construe them in the light most favorable to the Plaintiff. *America West*, 320 F.3d at 931; *Silicon Graphics*, 183 F.3d at 983. However, in determining whether there has been a strong inference of scienter, the Court must consider *"all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *America West*, 320 F.3d at 938 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002)) (emphasis in original). These statements appear to be contradictory, but the tension can be resolved by accepting a plaintiffs' allegations as true and viewing them in the light most favorable to the plaintiff, except when determining whether scienter has been adequately pled, in which case the Court can draw inferences both favorable and unfavorable to the plaintiff. *In re NorthPoint Communications Group, Inc., Sec. Litig.* *("NorthPoint II")*, 221 F.Supp.2d 1090, 1094 (N.D.Cal.2002) ("[T]he lenient inferences in plaintiff's favor that are normally *de rigeur* in considering a motion to dismiss cannot paper over key factual deficiencies in a securities-fraud complaint."). If the Court could not draw inferences unfavorable to the plaintiff in determining scienter, the PSLRA's strong inference requirement would be eviscerated, and Congress's basic purpose in enacting the PSLRA would be thwarted *Gompper*, 298 F.3d at 896–97. The Court concludes that it can draw inferences both favorable and unfavorable to the plaintiff only when de-

termining whether scienter has been adequately pled.

**A. Rule 8(a) "Short and Plain" Statement of the Basis for the Claim**

Defendants Hunsberger and Fuhlendorf argue that the CCAC violates the requirement that a complaint set forth a "short and plain" statement of the basis for their claims under FED. R. CIV. P. 8(a). The CCAC is 65 pages long, and contains some overlapping and conclusory statements. The CCAC identifies the allegedly false statements, and the length of the pleading is not unreasonable given the numerous allegations. The CCAC does not violate Rule 8(a).

**B. Plaintiffs' Theory of Fraud**

Plaintiffs' allegations that Defendants violated Section 10(b) of the 1934 Act, Rule 10b–5, and Section 20(a) of the 1934 Act are based on a fraud-on-the-market theory. The premise of the fraud-on-the-market theory is that "the market price of shares traded on well-developed markets reflects all publicly available information." *Basic*, 485 U.S. at 246, 108 S.Ct. 978. Buyers and sellers of stock rely on the integrity of the market price. *Id.* Thus, the Supreme Court created a rebuttable presumption of reliance by investors on any public material representations for purposes of a Rule 10b–5 claim. *Id.* at 247–48, 108 S.Ct. 978. Plaintiffs contend that Defendants' false and misleading statements in SEC filings, press releases, and conversations with analysts resulted in artificially inflated prices for Metawave's stock.

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' fraud theory cannot be sustained because the allegations that there was no demand for the SpotLight

GSM product are untrue.[6] Hunsberger and Fuhlendorf claim there is evidence that the SpotLight GSM product did work, and that there was increasing demand for it during the Class Period Hunsberger and Fuhlendorf attempt to rely on the truth of the documents for which they requested judicial notice. RJN 2:107, 2:119–20, 2:137, 2:141, 2:144, 26:614, 26:624, 32:682. In addition, Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' fraud theory does not make sense because Defendants responded promptly and appropriately to accounting problems and unauthorized side letters that were discovered, rather than try to inflate stock prices. Hunsberger and Fuhlendorf point out that the CCAC even mentions that Metawave responded to accounting concerns. CCAC ¶¶ 56–57, 155–158.

The Court did not take judicial notice of the truth of the documents Defendants Hunsberger and Fuhlendorf submitted. A quick response to accounting problems does not counter evidence of fraudulent intent. *In re Nuko Info. Sys., Inc. Sec. Litig.,* 199 F.R.D. 338, 344 (N.D.Cal.2000). The disagreement over the issues of whether the SpotLight GSM product actually worked, and whether Defendants' response to accounting problems was appropriate, give rise to factual disputes that must be resolved in the light most favorable to Plaintiffs for purposes of Defendants' motion to dismiss.

## C. Confidential Witnesses [7]

■ The CCAC relies heavily on the statements of several confidential wit-

nesses who were formerly employed by Metawave. CCAC ¶¶ 31–39. The confidential witnesses state that Metawave knew of the alleged accounting problems, knew that the GSM products did not work, and knew that there was no demand for the GSM product in Asia. *Id.* ¶¶ 44–45, 51–55, 64, 67–69, 75–80, 83–84, 87–90, 94–96, 105–12, 116–17, 123–24, 128–31, 134–35, 137, 143. Hunsberger and Fuhlendorf argue that Plaintiffs' reliance on unidentified "confidential witnesses" does not satisfy the pleading standards of the PSLRA, citing *In re NorthPoint Communications Group, Inc. Sec. Litig. ("NorthPoint I")*, 184 F.Supp.2d 991, 999–1001 (N.D.Cal. 2001). Defendants Hunsberger and Fuhlendorf argue that information is lacking as to how the confidential witnesses acquired their knowledge, and that confidential witnesses who would be expected to have personal knowledge provide little detail in the CCAC. *Northpoint I*, 184 F.Supp.2d at 1000, *Berger v. Ludwick,* Nos. 97–728, 97–2347, 2000 WL 1262646, at *4, 6, 2000 U.S. Dist. LEXIS 12756, at *15–21 (N.D.Cal. Aug. 17, 2000), *aff'd,* 15 Fed.Appx. 528, 2001 WL 868355 (9th Cir. 2001).

Plaintiffs respond that the CCAC provides adequate detail because it contains detailed job descriptions, responsibilities, and specific dates of employment for each of the confidential witnesses. Plaintiffs contend that they need not reveal *all* the facts about a witness, but only those facts that "were material to the formation of their belief that the witness' [sic] statement is accurate." *In re Secure Comput-*

---

**6.** Defendants Hunsberger and Fuhlendorf also argue that Plaintiffs' fraud theory cannot be sustained because Plaintiffs have not alleged a concrete motive to commit fraud. This argument is discussed later in this Order.

**7.** The discussion regarding confidential witnesses in this section deals only with whether

the CCAC sufficiently describes the confidential witnesses and the bases for their personal knowledge. The issue of whether Plaintiffs' reliance on particular confidential witnesses is adequate to plead a strong inference of scienter as to each of Plaintiffs' claims is discussed later in this Order.

*ing Corp. Sec. Litig.,* 184 F.Supp.2d 980, 988 (N.D.Cal.2001). Plaintiffs distinguish the instant case from *Northpoint I,* 184 F.Supp.2d 991, in which the court granted defendants' motion to dismiss, in part because the complaint did not provide adequate details regarding confidential witnesses. Instead, Plaintiffs rely on *Northpoint II,* in which the court upheld the complaint on a motion to dismiss when the plaintiffs provided each witness's job title and tenure, and described their responsibilities. 221 F.Supp.2d at 1097.

 The precise amount of detail required in describing confidential witnesses varies based on the circumstances of the case. *Secure Computing,* 184 F.Supp.2d at 988. Plaintiffs are not required to name witnesses. *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir.2000); *In re Seebeyond Techs. Corp. Sec. Litig.,* 266 F.Supp.2d 1150, 1159–60 (C.D.Cal.2003), *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F.Supp.2d 1248, 1271 (N.D.Cal.2000). "To contribute meaningfully toward a 'strong inference' of scienter, however, allegations attributed to unnamed sources must be accompanied by enough particularized detail to support a reasonable conviction in the informant's basis of knowledge." *Northpoint II,* 221 F.Supp.2d at 1097 (citation omitted). Plaintiffs must plead "with substantial specificity" how confidential witnesses "came to learn of the information they provide in the complaint." *Northpoint I,* 184 F.Supp.2d at 1000. The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or "merely regurgitating gossip and innuendo." *In re Commtouch Software Ltd. Sec. Litig.,* No. 01–719, 2002 WL 31417998, at *3, 2002 U.S. Dist. LEXIS 13742, at *10 (N.D.Cal. July 24, 2002). The Court can look to "the level of the detail provided by the confidential witnesses, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *In re Cabletron Sys., Inc.,* 311 F.3d 11, 29–30 (1st Cir.2002).

### 1. Descriptions of confidential witnesses and their personal knowledge

The CCAC's descriptions of the nine confidential witnesses in paragraphs 31–39 sufficiently describes their job titles and responsibilities. *Northpoint II,* 221 F.Supp.2d at 1097. The CCAC provides specific dates of employment only for Confidential Witness No. 1 ("CW1") and Confidential Witness No. 5 ("CW5"). CCAC ¶¶ 31, 35. The CCAC states generally that the other confidential witnesses were employed "during the Class Period." *Id.* ¶¶ 32–34, 36, 38–39. However, the CCAC does not mention whether Confidential Witness No. 7 ("CW7") was employed during the Class Period. *Id.* ¶ 37. The Court concludes that to the extent the CCAC only provided that certain confidential witnesses were employed "during the Class Period," the CCAC fails to plead with substantial specificity.

Even if the CCAC sufficiently describes all the dates of employment for the confidential witnesses, the CCAC fails to adequately plead the bases of most of the witnesses' personal knowledge. Personal knowledge based on discussions at company meetings or statements allegedly made by Defendants Hunsberger and Fuhlendorf is not sufficiently pled. The CCAC does not contain the dates of these meetings, lists of attendees of meetings, or the substance of the matters discussed. The CCAC only contains adequate details concerning the basis of personal knowledge of CW1 and CW7. The Court will discuss

each of these confidential witnesses in turn.[8]

■ The CCAC describes CW1 as "Metawave's Senior Cost Accountant in charge of accounting for inventory from December 2000 through October 2001." *Id.* ¶ 31. The CCAC sets forth the basis of CW1's personal knowledge of the inventory accounting problems because of the inventory accounting work he personally performed, *id.* ¶¶ 51–55, 83–84, 87–90, specific instructions to violate GAAP allegedly given by Fuhlendorf, *id.* ¶ 55, and knowledge of internal reports that were inconsistent with reported financial statements, *id.* ¶¶ 80, 89, 129.

The statements concerning Metawave's lack of sales made by Confidential Witness No. 2 ("CW2"), a former Metawave sales director responsible for sales of products in a region of the United States, are opinion, vague, and do not show any basis of personal knowledge. *Id.* ¶¶ 44–45, 105.

The CCAC provides no basis of personal knowledge for the statements concerning lack of demand and sales in China attributed to Confidential Witness No. 3 ("CW3"), a former senior manager in charge of developing the GSM system. *Id.* ¶¶ 107, 110, 112, 131, 133–34.

Confidential Witness No. 4 ("CW4"), a former project manager who worked on the development of the GSM product, states that Program Review Meetings, Field Operations Meetings, and Budget Meetings were held "every couple weeks." *Id.* ¶ 74. CW4 appears to have been present at "several Program Review Meetings" during the third and fourth quarters of 2001, but CW4 only mentions that Liang was present at those meetings. *Id.* ¶ 135. There is no indication that CW4 was pres-

ent at any other meetings to know what was discussed, or whether the other Individual Defendants were present. *Id.* ¶¶ 75–76. CW4 provides no other basis of knowledge for his statements. *Id.* ¶¶ 68, 75–76, 94, 124, 131, 133–34.

CW5, a former design engineer, does not indicate the basis of his knowledge for many of the statements he makes. *Id.* ¶¶ 64, 69, 107–08, 112, 131, 133–34. CW5 states that he made a trip to China in the second quarter of 2001, when he learned that there were many unsold GSM products in distributors' warehouses. *Id.* ¶ 108. Even if CW5 learned this information, CW5's knowledge based on hearsay can not be imputed to the Individual Defendants.

Confidential Witness No. 6 ("CW6"), the Senior Program Manager for GSM operations during the Class Period, attended Program Review Meetings and conducted presentations. *Id.* ¶ 75. CW6 states that the Individual Defendants attended Program Review Meetings, but does not state which ones they attended, or when the meetings took place. *Id.* The CCAC fails to state a basis of personal knowledge for CW6's other statements, which are merely opinion, or vague. *Id.* ¶¶ 95–96, 128, 131, 133–34.

■ Assuming that CW7 was employed by Metawave throughout the Class Period, the CCAC provides sufficient details concerning how CW7, a former Metawave Systems Test Engineer, knew the GSM product did not actually work. *Id.* ¶¶ 67, 78–79, 106, 109, 111. The CCAC describes CW7's personal involvement in GSM lab and field trials, and responsibility for preparing and analyzing daily and weekly reports on GSM field trials. *Id.*

8. The Court does not discuss Confidential Witness No. 8 ("CW8") because the CCAC does not include any statements from CW8.

¶¶ 67, 78–79. However, the CCAC does not set forth the basis for CW7's statements of Defendants' scienter concerning demand for GSM in China or revenues from GSM sales in China. *Id.* ¶¶ 77, 96, 117, 128, 130–31, 133–34, 137.

Confidential Witness No. 9 ("CW9"), a former Software Engineer assigned to the GSM product, states that he attended a weekly "GSM update meeting" with GSM staff in early January 2002, at which he recalls that Defendant Liang acknowledged that GSM products were not viable, and that "our customers don't seem to want our system," so that Liang was not expecting any significant sales. *Id.* ¶ 143. CW9 does not indicate who else was at the meeting, and whether Defendants Hunsberger and Fuhlendorf were present. CW9 also states that at a meeting in December 2001, Hunsberger disclosed that Metawave needed to change its revenue recognition policy, but provides no detail as to how or why the existing policy would be changed. *Id.* Moreover, as an engineer, CW9 might not have had expertise concerning the implications of the change in revenue recognition. The statements of CW9 concerning failed GSM field trials in paragraph 64 of the CCAC are merely opinion, or vague. *Id.* ¶ 64.

### 2. Corroboration of confidential witnesses

In addition, Plaintiffs rely on *Cabletron,* 311 F.3d at 33, and *Commtouch,* 2002 WL 31417998, at *10, 2002 U.S. Dist LEXIS 13742, at *31, to contend that the witnesses' testimony is consistent and corroborates one another. The confidential witnesses corroborate with one another, to the extent that the information that they possessed overlapped. However, a shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allega-

tions themselves are not specific enough. *Nursing Home Pension Fund v. Oracle Corp.,* 242 F.Supp.2d 671, 682 (N.D.Cal. 2002).

The Court concludes that the CCAC does not sufficiently describe CW2, CW3, CW4, CW5, CW6, CW7, CW8, and CW9 by failing to provide their dates of employment, or a detailed basis of their personal knowledge of the facts alleged. The Court concludes that the CCAC adequately describes CW1 and the basis of CW1's personal knowledge. If the CCAC provided CW7's dates of employment, the Court would find that the CCAC sufficiently describes the basis of CW7's personal knowledge. The Court denies Defendants Hunsberger and Fuhlendorf's motion to dismiss solely on the ground that the CCAC has not sufficiently described the confidential witnesses. The Court turns now to consider whether Plaintiffs' reliance on particular confidential witnesses and other evidence establishes a strong inference of scienter.

### D. Falsity and Scienter

Plaintiffs rely on confidential witnesses, internal reports, the importance of the GSM product to Metawave, the responsibilities of the Individual Defendants, Metawave's restatement of its financial reports, violations of accounting rules, and other circumstantial evidence to argue that Defendants made false and misleading statements during the Class Period concerning demand for the GSM product, Metawave's revenue reporting, and inventory accounting.

### 1. Allegations of motive to commit fraud other than sales of stock

 With respect to all the allegedly false statements, Defendants Hunsberger and Fuhlendorf argue that Plaintiffs fail to provide a cognizable motivation for com-

mitting fraud. Hunsberger and Fuhlendorf claim that the absence of any sales of Metawave stock by the defendants during the Class Period negates an inference of scienter, relying on *In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1425 (9th Cir.1994), and *Ronconi,* 253 F.3d at 435. Defendants Hunsberger and Fuhlendorf contend that Plaintiffs' other alleged motives for committing fraud, such as raising financing for Metawave, are too generic to plead fraud.

Plaintiffs respond that the motive of raising capital for Metawave through private stock sales provided a concrete motive for engaging in fraud. Plaintiffs argue that the Individual Defendants did not have to sell stock to create a strong inference of scienter because other allegations support a finding of scienter.

■ Scienter can be established even if there were no sales of stock by officers during the class period, if there were other motives for fraud such as receiving benefits tied to the company's financial performance. *America West,* 320 F.3d at 944 (citing *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992)). However, Plaintiffs' other alleged motives for committing fraud are generic, and do not involve the personal receipt of benefits based on Metawave's financial performance or stock price. *Lipton,* 284 F.3d at 1038 (holding that the alleged motive of securing credit and gaining regulatory approval abroad were insufficient to meet the PSLRA pleading standard), *In re PetSmart, Inc. Sec. Litig.,* 61 F.Supp.2d 982, 998–99 (D.Ariz.1999) (holding that alleged motives related to raising capital were generic and insufficient to establish motive), *In re Boeing Sec. Litig.,* 40 F.Supp.2d 1160, 1175 (W.D.Wash.1998) (holding that alleged motive of increasing market share was generic). Plaintiffs' contention that Defendants Hunsberger and Fuhlendorf

engaged in fraud because they were "counting on GSM to drive future growth," CCAC ¶ 96, is a generic motive that would apply to every company that introduced a new product Likewise, Plaintiffs' allegation that Defendants Hunsberger and Fuhlendorf engaged in fraud to raise money, *id.* ¶ 184, is a motive that courts have found to be too generic to plead fraud. The court in *Lipton* stated:

> If scienter could be pleaded merely by alleging that officers and directors possess motive and opportunity to enhance a company's business prospects, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." PathoGenesis' alleged desires to obtain favorable financing and to expand abroad are in themselves ordinary and appropriate corporate objectives. Such routine business objectives, without more, cannot normally be alleged to be motivations for fraud.

284 F.3d at 1038 (internal citation omitted). Plaintiffs have not sufficiently alleged a motive for the Individual Defendants' fraud that would lead to a strong inference of scienter. This weighs in favor of granting Defendants Hunsberger and Fuhlendorf's motion to dismiss.

### 2. Allegations of no demand for SpotLight GSM

■ Plaintiffs allege that Defendants made false and misleading statements about demand for the SpotLight GSM product in China in eight press releases, and in conversations with analysts in April 2001 and July 2001. CCAC ¶¶ 60–61, 98–103, 118–19, 138. Plaintiffs allege that Defendants falsely stated that demand for the GSM product existed, and was increasing. Plaintiffs allege that Metawave did not sell any product in China, but merely shipped

defective GSM products to Asian distributors. *Id.* ¶ 66. Plaintiffs allege that Defendants devised a scheme to warehouse its GSM products with Asian distributors and improperly record revenue for the GSM products that had failed field and lab trials. *Id.* ¶¶ 66–67, 69. Plaintiffs claim that Defendants also entered into side letters with distributors that allowed distributors to return products that were not sold to end users or successfully deployed. *Id.* As a result, Plaintiffs assert that no real sales had occurred, and that Metawave merely consigned its defective inventory to its Asian distributors. *Id.*

Defendants Hunsberger and Fuhlendorf contend that the CCAC does not satisfy the PSLRA's requirement of alleging falsity with particularity. 15 U.S.C. § 78u–4(b)(1). Hunsberger and Fuhlendorf argue that Plaintiffs only generally allege that there was little or no demand for the GSM product, and that the quality of the product was poor, without providing specific information regarding field tests, such as which ones failed, and how they failed. Hunsberger and Fuhlendorf contend that many of the facts or sources on which Plaintiffs rely to show falsity have not been pled with sufficient detail, including the overstocking of smart antennas in Metawave's distributors' warehouses, CCAC ¶¶ 106, 108, 110, 131, 139; construction of base stations that would preclude use of the GSM product, *id.* ¶¶ 64, 94; and statements of confidential witnesses concerning failed field tests and lack of demand in China for GSM products, *id.* ¶¶ 64, 67, 69, 95, 107–09, 111–12, 140. Hunsberger and Fuhlendorf argue that reasonable inferences drawn from other facts on which Plaintiffs rely do not show that the statements about demand were false. In particular, Hunsberger and Fuhlendorf point to allegations such as Metawave's failure to provide technical support, *id.* ¶ 66; the existence of side letters, *id.* ¶¶ 66, 80, Me-

tawave's restatement of revenue, *id.* ¶¶ 114, 133–34, 140; the temporal proximity of the restatement to earlier public announcements, *id.* ¶¶ 134, 142; and statements concerning mismanagement, *id.* ¶¶ 94–95.

Defendants Hunsberger and Fuhlendorf argue that the CCAC fails to provide details regarding Defendants' knowledge that there was insufficient demand for the GSM product. Hunsberger and Fuhlendorf contend that Plaintiffs' allegations based on confidential witnesses are inadequate to show that Defendants knew the statements regarding demand were false when made. Hunsberger and Fuhlendorf claim that references to unidentified internal reports and meetings, and Defendant Hunsberger's trips to China, are insufficient to show scienter.

Plaintiffs respond that they have adequately identified that Metawave's statements about the GSM product were false or misleading because the product did not work and Metawave eventually acknowledged there was insufficient demand. However, even if Metawave's statements regarding the GSM product later proved to be false, Plaintiffs must show Defendants Hunsberger and Fuhlendorf knew the statements were false at the time they were made. Plaintiffs claim that the CCAC contains direct, detailed evidence of falsity and scienter, relying heavily on statements from several confidential witnesses regarding the failed lab and field test trials. Plaintiffs also rely on internal reports and meetings regarding the failed trials. Plaintiffs argue that the fact that the GSM product failed these test trials meant that demand could not have existed because the product was not functional. Plaintiffs also contend that because the GSM product was central to Metawave's continued survival, knowledge of the status of the GSM product can be imputed to

Defendants Hunsberger and Fuhlendorf as top executives.

### a. Confidential witnesses

Defendants Hunsberger and Fuhlendorf claim that Plaintiffs' reliance on confidential witnesses for their scienter allegations is inadequate. Hunsberger and Fuhlendorf claim that Plaintiffs' allegations of concerns raised by Metawave employees concerning lack of sales are not supported by adequate details about the employees or the specific dates when concerns were raised.

Plaintiffs' reliance on confidential witnesses fails to establish a strong inference of scienter. CW7, a former Metawave Systems Test Engineer, states that the GSM product failed field trials and lab tests, and that Defendants knew of the failure of the product in the fourth quarter of 2000. *Id.* ¶ 67. CW7 states that the practice of shipping out products that failed tests was ordered by Metawave executives in order to show a positive response from customers. *Id.* CW7 also says he was convinced that Metawave's management team knew the company's prospects were not bright, and blatantly lied to hide the truth from investors and the public. *Id.* ¶¶ 78, 96, 117. CW7 states that based on his personal knowledge of preparing and reviewing reports of GSM lab and field trials, Metawave management knew what was going on with the failed GSM trials. *Id.* ¶ 78. CW7 states that "Company executives" would receive substantive reports about specific trial failures, then "march right out" and announce to other employees and the public that Metawave had had another successful GSM trial. *Id.* CW7 recalls that Hunsberger visited his engineering work area at least every "couple of weeks" to ask how things were going. *Id.* ¶ 79. CW7 also states that Defendant Fuhlendorf was briefed weekly about expenses associated with failed lab and field tests, as well as sales problems, during meetings involving accounting personnel. *Id.*

The CCAC does not provide CW7's basis of personal knowledge regarding why products that failed tests were ordered to be shipped, or who ordered the shipments. CW7's belief that Metawave executives lied to hide the truth from investors and the public is merely his opinion. CW7 would be expected to have personal knowledge of the failed tests based on preparation of the internal reports regarding failed GSM trials that Metawave executives received. However, CW7 never states that Defendants Hunsberger and Fuhlendorf actually received these reports, although Hunsberger and Fuhlendorf would presumably be among the "Company executives" who received these reports. *Id.* ¶ 78. CW7 does not explain why the GSM product failed tests. CW7's statements concerning meetings with Hunsberger do not specify when the meetings took place or what was discussed. CW7 merely states that Hunsberger visited "his engineering work area" to "ask how things were going," which does not indicate that CW7 himself spoke with Hunsberger, or that failed trials were discussed. *Id.* ¶ 79. The CCAC does not allege that CW7 actually attended meetings involving accounting personnel at which Fuhlendorf was briefed on expenses for failed tests and sales problems. Thus, Plaintiffs' reliance on CW7 fails to establish a strong inference of scienter.

CW4, a former project manager, states that the Individual Defendants knew the number of actual GSM products sold in Asia because of their attendance at Field Operations Meetings at which projections and actual deployments of GSM products were discussed. *Id.* ¶ 76. As discussed above, the CCAC does not adequately de-

scribe the basis of CW4's personal knowledge because it is not clear that CW4 was present at these meetings Moreover, the Individual Defendants knowledge of the amount of actual *sales* in Asia does not necessarily mean that they knew that the statements concerning *demand* for GSM were false. Rather, the fact that the Individual Defendants knew there were some sales in Asia would lead to the inference that there was some demand for GSM products.

Plaintiffs' reliance on statements of CW3 and CW5 regarding concerns raised by Metawave employees concerning lack of sales and demand do not indicate how or when the confidential witnesses knew such concerns existed, and are based on hearsay. *Id.* ¶ 107.

Accordingly, the Court concludes that Plaintiffs have failed to plead a strong inference of scienter based on confidential witnesses.

 b. Allegations of internal reports and meetings lack detail

Defendants Hunsberger and Fuhlendorf contend that Plaintiffs' assertions that the Individual Defendants received reports about GSM trial failures, that Defendants obtained information at meetings, and that an internal investigation of the GSM project had been conducted in August and September 2001, are insufficient. *Id.* ¶¶ 75–79, 96, 115–16, 137. Defendants Hunsberger and Fuhlendorf argue that without further specifics regarding the internal reports and investigation, Plaintiffs cannot show that Defendants had knowledge of the lack of demand.

Plaintiffs respond that their allegations based on the internal reports CW7 prepared and the meetings CW7 had with Defendants Hunsberger and Fuhlendorf are sufficiently detailed. CW7 stated that Systems Test Engineers who conducted GSM trials prepared and submitted daily and weekly lab and field performance trial reports. *Id.* ¶¶ 67, 78. CW7 stated that the reports contained at least three attachments including raw lab and field test data, file logs of performance errors, and comments of engineers conducting the trials. *Id.* CW7 asserted that Hunsberger visited his engineering work area at least every "couple of weeks" to ask how things were going. *Id.* ¶ 79. CW7 stated that Defendant Fuhlendorf was briefed weekly during meetings about expenses associated with failed lab and field tests, as well as sales problems. *Id.*

In *In re Vantive Corp. Securities Litigation*, 110 F.Supp.2d 1209 (N.D.Cal.2000), the court stated that the plaintiffs' reliance on "reports generated on a weekly and monthly basis in the Finance Department" were "boilerplate allegations," and held that their failure to cite "a single specific report or any specific dates" was insufficient to meet the *Silicon Graphics* pleading standard. *Id.* at 1218. CW7 refers to internal reports, but does not point to specific reports or specific dates. CW7 does not indicate what the internal reports contained, and does not explain what engineering defects and test failures plagued the GSM product. CW7 never affirmatively states that Defendants Hunsberger and Fuhlendorf specifically received these reports that "Company executives" received. CCAC ¶ 78. CW7's statements concerning meetings with Hunsberger do not provide details such as when the meetings took place and what was discussed. *Id.* ¶ 79. CW7 does not state that he attended the weekly meetings involving accounting personnel at which Fuhlendorf was allegedly briefed on expenses for failed tests and sales problems, or provide any additional details concerning these meetings. The CCAC does not describe the allegations concerning the internal investigation of the

GSM project with particularity, other than that the investigation occurred around August or September 2001. *Id.* ¶ 137. The instant case cannot be distinguished from *Vantive* on the grounds that Plaintiffs' allegations here are based on firsthand knowledge, and that Metawave restated financial results by material amounts.

### c. Circumstantial evidence

Plaintiffs contend that the inference of scienter is bolstered by circumstantial evidence, such as the fact that the GSM product had not been successful in other markets, and that Metawave was counting on the Asian market. *Id.* ¶¶ 40–46. Plaintiffs urge the Court to infer from this circumstantial evidence that the Individual Defendants were up to date on all material developments in GSM testing and marketing in China. Plaintiffs argue that as top executives of a small company that essentially focused on one product, Hunsberger and Fuhlendorf would have knowledge of the lack of demand for the GSM product. Plaintiffs rely on *Epstein v. Itron, Inc.,* 993 F.Supp. 1314 (E.D.Wash.1998), in which the court stated there was a strong inference that the company's key officers had knowledge of the fact of the technological incompatibility of two products that were "central to [the company's] continued survival." *Id.* at 1326. The *Epstein* court further stated that "facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers." [9] *Id.* Plaintiffs also interpret *America West* as sup-

porting their view that there is a strong inference that a company and its senior officers know of matters vital to a company. The *America West* court held that members of the board of directors and various executive committees who attended board meetings would have known of repurchasing authorization for millions of dollars worth of stock and the existence of Federal Aviation Administration investigations concerning maintenance problems. 320 F.3d at 942–43.

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' core product argument is not viable, relying on *Lipton,* 284 F.3d 1027 (9th Cir.2002). Hunsberger and Fuhlendorf contend that no distinction can be made in the Ninth Circuit on the basis of the importance of a particular product. The product at issue in *Lipton* accounted for over 98% of the company's annual sales. *Id.* at 1031 n. 2. The court held that "[i]n the circumstances of a new product and developing market, we do not think it can be fairly alleged that the company knew that patient demand in the future year would not keep pace with prior sales growth." *Id.* at 1039.

Plaintiffs have not sufficiently pled that Defendants Hunsberger and Fuhlendorf should have known of the lack of GSM demand. Unlike *America West,* Plaintiffs do not provide details such as any meetings Hunsberger and Fuhlendorf attended at which the lack of GSM demand was discussed.

Metawave's March 14, 2002 press release and the restatement of revenue reported in the first and third quarters of

9. The Court notes that *Epstein* and its presumption that knowledge can be imputed to key executives may not be viable in the Ninth Circuit after *Silicon Graphics,* 183 F.3d at 974–75, in which the court expressly rejected the Second Circuit's pleading requirement of mere motive and opportunity, or an inference of recklessness, that was used in *Epstein.* Instead, *Silicon Graphics* imposed a pleading requirement of "a strong inference of 'deliberate recklessness.'" *Id.* at 977; *see In re Ashworth Sec. Litig.,* No. 99–0121, 2000 WL 33176041, at *11, 2000 U.S. Dist. LEXIS 15237, at *33–34 (S.D.Cal. July 18, 2000) (stating that the *Epstein* presumption is not persuasive in light of *Silicon Graphics* ).

2001 indicate that there was insufficient demand for the GSM product. However, the Court concludes that Plaintiffs have not sufficiently pled Defendants' knowledge of the falsity of the statements made about GSM demand. The confidential witnesses, internal reports and meetings, and circumstantial evidence, taken together, lead to an inference of scienter, but not a strong inference of scienter.

### 3. Allegations of false revenue recognition

■ Plaintiffs allege that Defendants falsely reported revenue for sales of the SpotLight GSM product in China in Metawave's SEC filings for the first quarter of 2001 and third quarter of 2001. CCAC ¶¶ 62, 120. Plaintiffs allege that Defendants improperly recognized revenue under accounting rules because Metawave later restated its financial reports in March 2002 by a difference of about $7 million in revenue. *Id.* ¶ 179, RJN 2.162. Defendants Hunsberger and Fuhlendorf contend that Plaintiffs fail to sufficiently plead scienter with respect to Metawave's statements regarding revenues from GSM sales.

### a. Fraud by hindsight not actionable

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' allegations regarding the write-off of inventory, restatement of earnings, and discontinuance of the Spot-Light GSM product are derived in hindsight from Metawave's March 14, 2002 announcement. CCAC ¶¶ 114, 133, 134, 140. "Fraud by hindsight is not actionable." *Ronconi,* 253 F.3d at 430 n. 12. (internal quotation marks and citations omitted). The Court must consider whether Plaintiffs have set forth why Defendants' statements were untrue or misleading at the

time they were made. *Yourish v. Cal. Amplifier,* 191 F.3d 983, 993 (9th Cir.1999) (citing *In re GlenFed Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994)). Defendants Hunsberger and Fuhlendorf contend that Plaintiffs have not pled specific details regarding when Defendants became aware of facts leading to the inventory write-off, earnings restatement, and discontinuance of the GSM product. Thus, Hunsberger and Fuhlendorf conclude that Plaintiffs' claims cannot be linked to particular earlier statements to show that those statements were false when made.

The issue presented is whether Plaintiffs' reliance on confidential witnesses who assert that Defendants Hunsberger and Fuhlendorf had knowledge at the time the allegedly false statements were made is sufficient, or whether Plaintiffs are merely alleging fraud by hindsight.[10] Plaintiffs rely on Metawave's restatement of revenues in March 2002, the "fact" that Metawave's sales were "consignment transactions," and the "fact" that Metawave recognized revenue in violation of GAAP and its internal policy, to show that Metawave's statements prior to March 2002 concerning GSM demand and its financial results were false when made. However, the Court cannot assume that facts known at a particular time were also known at earlier times. Metawave's disclosures in its March 2002 press releases do not show that Metawave knew before March 2002 that its previous statements concerning GSM demand and its financial results were false when made.

### b. Existence of side letters as insufficient evidence of scienter

■ Plaintiffs allege that Metawave's sales of the GSM product to distributors in

---

**10.** Plaintiffs' reliance on confidential witnesses to show Defendants' scienter of im-

proper revenue recognition is discussed later in this Order.

China were not actually sales, but rather consignments. CCAC ¶¶ 14, 66, 71. Plaintiffs claim that "side letters" existed that gave customers the right to return GSM products that had been shipped.[11] *Id.* ¶¶ 66, 80, 128. Plaintiffs argue that the side letter transactions fit the definition of a consignment sale under SEC Staff Accounting Bulletin ("SAB") No. 101, which describes a consignment sale as one where there is a right of return and "the seller has significant obligations for future performance to directly bring about the resale of the product." SAB No. 101 (Question 2), 17 C.F.R. pt. 211 (December 3, 1999). Plaintiffs allege that the products shipped to the Asian distributors subject to the side letters were defective, and even if they worked could not be sold to end users without the involvement of Metawave's technical support personnel. CCAC ¶¶ 66–68, 74, 122–24.

(i) Sale or consignment

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs have not sufficiently pled that the SpotLight GSM sales were consignment sales. The determination of whether a sale is in substance a consignment "require[s] a careful analysis of the facts and circumstances of the transactions, as well as an understanding of the rights and obligations of the parties, and the seller's customary business practices in such arrangements." SAB No. 101 (Interpretive Response to Question 2). Hunsberger and Fuhlendorf contend that Plaintiffs fail to allege specific transactions, or details about the transactions, sufficient to

show that they were consignment sales under SAB No. 101 or other accounting literature. Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' references to side letters lack sufficient details such as the name of the distributor, the number of letters that existed, the description of the contents of the letters, the dates of the letters, or when Defendants became aware of the letters *See In re Comshare, Inc. Sec. Litig.,* No. 96–73711, 1997 WL 1091468, at *10, 1997 U.S. Dist. LEXIS 17262, at *29 (E.D.Mich. Sept. 18, 1997) (holding that conclusory and speculative allegations about defendants' knowledge of, or access to, side letters did not raise a strong inference of scienter), *aff'd,* 183 F.3d 542, 553–54 (6th Cir.1999).

The Court concludes that Plaintiffs have failed to present details of these side letter agreements sufficient to support their theory that Defendants' sales of the GSM product were consignment sales. Although the CCAC alleges that Defendant Liang negotiated the improper side agreements, the CCAC presents no other details about the side letters. CCAC ¶ 80. Plaintiffs have not sufficiently pled that the side letter transactions fit the definition of "consignment sales" under SAB No. 101.

(ii) Knowledge of side letters

Plaintiffs allege that Defendants Hunsberger and Fuhlendorf knew of the side letters before the disclosure in March 2002 because on January 29, 2002, Metawave acknowledged in a press release that it had

11. Although the CCAC and Plaintiffs' briefs discuss these "side letters," no copies of these documents have yet been provided to the Court. Under the PSLRA, no discovery in a securities fraud action is permitted prior to the resolution of a pending motion to dismiss. 15 U.S.C. § 78u–4(b)(3)(B) provides that "all discovery and other proceedings shall be stayed during the pendency of any motion to

dismiss." However, the CCAC does not allege, and the confidential witnesses do not discuss, the terms or substance of the side letter agreements. If Plaintiffs believe these side letter agreements are so crucial to their showing of fraud, one would expect the dates and the substance of the agreements. No such detail has been provided.

analyzed its distributor arrangements and elected not to recognize revenue for products shipped to China in the fourth quarter of 2001. RJN 16:265. Plaintiffs allege that Defendant Hunsberger had knowledge because he was involved with Metawave's Chinese customers, made a trip to China in the fall of 2001 to deal with distributors' failure to timely pay invoices, and stated he was aware of the revenue recognition problem at least a month before the revenue recognition policy was altered CCAC ¶¶ 97, 116, 143. CW9, a Metawave Software Engineer, states that at a meeting in December 2001, Hunsberger said, "Since we don't have any end-users in sight, we need to change our revenue application practice." *Id.* ¶ 143. Plaintiffs allege that Fuhlendorf knew of the side letters because of his involvement in sales in China, his trip to China to investigate invoice payment problems, and the fact that he was fired when the side letters came to light and the GSM product line discontinued. *Id.* ¶¶ 116, 157. Plaintiffs contend that Hunsberger and Fuhlendorf can be presumed to know of the side letters because they were important to Metawave's core business operations.

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs have not sufficiently pled that Defendants knew the side letters existed when they made the alleged misrepresentations. Until the discovery of the side letters, there may be nothing improper about viewing the shipments of GSM products to distributors as sales and booking revenue accordingly. Defendants Hunsberger and Fuhlendorf contend that the side letters were discovered only in March 2002, when corporate restructuring had already begun. RJN 2:103 ("In March of 2002, we decided upon a restruc-

turing plan to discontinue the SpotLight GSM product, reduce our workforce and consolidate facilities."); RJN 8:242 ("The restatement doesn't change our restructuring efforts, in fact the restructuring efforts were already underway when we discovered these unauthorized commitments."). Restructuring efforts that may have commenced in March 2002 would have begun no more than two weeks before the press release of March 14, 2002 that disclosed the existence of side letters and the need to restate revenues.[12]

Plaintiffs' allegations of scienter regarding the side letters are not sufficiently pled. Plaintiffs rely solely on their own conclusions regarding when Defendants Hunsberger and Fuhlendorf became aware of the side letters. No confidential witnesses provide statements about the existence of side letters. CW9 did not state that Hunsberger acknowledged the existence of side letters, merely that a change in revenue recognition was necessary because there were no end users. Plaintiffs' allegations that Liang personally negotiated the side letters are vague, and even if true would not be a basis for fraud as to Defendants Hunsberger and Fuhlendorf.

### c. GAAP violations as insufficient evidence of scienter

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' generalized allegations of Generally Accepted Accounting Principles ("GAAP") and other accounting rules do not adequately show scienter. CCAC ¶¶ 55, 65, 70, 74, 121, 125, 146, 162–74, 182–83. To plead fraudulent intent based on GAAP violations, plaintiffs must allege facts showing that

12. Because the Court considers the documents on which Hunsberger and Fuhlendorf rely only for the purpose of determining the contents of the documents, not for the truth of the statements therein, the Court makes no finding as to whether restructuring efforts had actually begun by the time of the March 14, 2002 press release.

(1) specific accounting decisions were improper, and (2) defendants knew specific facts at the time that rendered their accounting determinations fraudulent. *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390–91 (9th Cir. 2002); *In re Software Toolworks Inc.*, 50 F.3d 615, 627–28 (9th Cir.1994). Defendants Hunsberger and Fuhlendorf contend that Plaintiffs have not identified particular accounting decisions or transactions that were restated or reversed. Defendants Hunsberger and Fuhlendorf argue that Plaintiffs only point generally to the March 14, 2002 press release and Metawave's annual report for the year ending December 31, 2001, which restated earnings from the first and third quarters of 2001. Hunsberger and Fuhlendorf argue that no facts support Plaintiffs' contention that statements about Metawave's revenue recognition policy—before it changed its policy—were false.

Plaintiffs respond that they sufficiently pled scienter regarding Metawave's false statements about revenue recognition. CCAC ¶¶ 62–63, 120, 145–46. Plaintiffs argue that because none of the $7.1 million in revenues attributed to China sales actually existed, the major impact of the restatement on revenues is support for a strong inference of scienter. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 n. 18 (1st Cir.1999), *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 638–39 (E.D.Va.2000); *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1255–56 (N.D.Ill.1997). Plaintiffs contend that Metawave's restatement is an admission that it issued false and misleading financial reports in violation of GAAP and its own internal accounting policies. CCAC ¶¶ 62, 178–81. GAAP provides that a restatement should be issued only as a result of errors caused by (i) a mathematical mistake; (ii) mistakes in the application of accounting principles, or (iii) oversight or misuse of facts that exist-

ed at the time the financial statement was prepared. Accounting Principles Board Opinion No. 20, ¶ 13. Thus, because the restatement occurred pursuant to the "oversight or misuse" reason, CCAC ¶ 180, Plaintiffs claim that Metawave's financial statements were false at the time they were made *Commtouch*, 2002 WL 31417998, at *7, 2002 U.S. Dist. LEXIS 13742, at *22–25, *In re Cylink Sec. Litig.*, 178 F.Supp.2d 1077, 1084 (N.D.Cal.2001). The mere fact of Metawave's restatement supports an inference that Defendants Hunsberger and Fuhlendorf knew the financial reports were false when issued. *Cylink*, 178 F.Supp.2d at 1084. However, mere "oversight or misuse" is not the same thing as fraud, and fails to establish a strong inference of deliberate recklessness. "Oversight or misuse" is more closely akin to carelessness, or failure to exercise reasonable care, than fraud. Therefore, Plaintiffs' contention that Metawave's restatement is an admission that Defendants issued false and misleading financial reports is without merit.

Plaintiffs also argue that the improper revenue reporting could not be deemed a difference of accounting judgments because the accounting rules clearly precluded what Defendants did. Plaintiffs allege that Hunsberger understood the requirements of the accounting rules, based on his conference call statement of March 14, 2002 in which he stated, "That given the accounting rules, you guys know that, that is reasonably clear here, given the accounting rules this would have precluded revenue recognition." RJN 8:241 However, Hunsberger's statement in the conference call did not occur until after the existence of the side letters became known and the accounting decision had been made, and therefore does not show whether or not he knew at the time of the accounting deci-

sion that the revenue was being improperly recognized.

■ Scienter "requires more than a misapplication of accounting principles." *Worlds of Wonder*, 35 F.3d at 1426 (quoting *SEC v. Price Waterhouse*, 797 F.Supp. 1217, 1240 (S.D.N.Y.1992)). "The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Boeing*, 40 F.Supp.2d at 1177 (citing *Worlds of Wonder*, 35 F.3d at 1426–27). However, particular facts concerning significant and specific GAAP violations can support an inference that there was scienter.[13] *Cylink*, 178 F.Supp.2d at 1082. When alleging irregularities in revenue recognition, Plaintiffs should allege details such as: (1) the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transactions; (3) the dates of any transactions; or (4) the identities of any of the customers or company employees involved in the transactions. *Greebel*, 194 F.3d at 204. Plaintiffs do not specify any actual transactions that led to overstatements of revenue. The failure to do so undermines Plaintiffs' scienter allegations. *In re Pac. Gateway Exch., Inc. Sec. Litig.*, 169 F.Supp.2d 1160, 1167 (N.D.Cal.2001), *Ashworth*, 2000 WL 33176041, at *10, 2000 U.S. Dist. LEXIS 15237, at *28.

Because the CCAC contains only blanket assertions of the side letter agreements and accounting irregularities without specific details, the Court concludes that Plaintiffs have failed to adequately establish a strong inference of scienter

concerning Metawave's revenue recognition based on violations of GAAP.

### d. Confidential witness testimony as insufficient evidence of scienter

Plaintiffs allege that Defendants knew of the fraudulent accounting long before they made changes to their books because CW1, Metawave's former senior cost accountant for inventory, stated that Defendants received monthly "Redbooks" containing sales and revenue figures, updated financial statements, balances, reserves, and any other changes to Metawave's financial position. CCAC ¶ 80. Plaintiffs allegations of Defendants' scienter based on CW1's statements that Defendants received Redbooks are insufficient because Plaintiffs have not specifically indicated what the Redbooks disclosed. *Nursing Home*, 242 F.Supp.2d at 681. Plaintiffs' allegations of improper revenue recognition hinge on when the Individual Defendants became aware of the side letter agreements. Plaintiffs have not alleged that the Redbooks provided such information to Defendants. Furthermore, the CW1's responsibilities did not include accounting for revenue, but only for inventory. CCAC ¶ 31. Thus, the Court concludes that Plaintiffs allegations of knowledge based on Defendants Hunsberger and Fuhlendorf's access to the Redbooks and CW1's testimony are insufficient to support a strong inference of scienter.

The other confidential witness on whom Plaintiffs rely fail to present sufficient detail as to how they knew that the Individual Defendants had knowledge of improper

---

**13.** The complaint in *Cylink* involved particular facts including the amount by which specific transactions resulted in overstatements of revenue, and a description of the product, the customer, and the employees involved in the transaction. 178 F.Supp.2d at 1083. In the instant case, the CCAC indicates that the

GSM product was involved in the side letter transactions, and alleges that Liang negotiated the side letters. CCAC ¶ 80. However, the CCAC does not provide other basic details such as the dates of the transactions, or the identities of the customers.

revenue recognition. Plaintiffs rely on CW2, a former Metawave sales director in a region of the United States, who confirms that there was "information at [Metawave]" indicating that GSM products sold to Asian distributors were actually consignment sales. *Id.* ¶ 66. CW2 does not explain the basis of his personal knowledge. CW2 was not based in Asia, and was not alleged to have had responsibility for international sales. CW2 provides no specific details regarding the "information at [Metawave]," whether the Individual Defendants had access to the information, or when the Individual Defendants became aware of the improper revenue recognition.

CW4, a former Metawave project manager, states that Metawave had "significant ongoing obligations" to its Asian distributors to ensure that GSM products were successfully deployed into wireless networks. *Id.* ¶ 68. CW4 also states that Metawave lacked sufficient personnel to fulfill the necessary technical support obligations. *Id.* CW4 does not indicate the basis for his knowledge of Metawave's shortcomings in deploying smart antennas into wireless networks. Furthermore, CW4's statements contain only opinion as to how extensive were Metawave's obligations, and its inability to meet those obligations. Therefore, the Court concludes that Plaintiffs' reliance on confidential witnesses to demonstrate. Defendants' scienter of Metawave's revenue recognition problems is insufficient to show a strong inference of scienter.

e. Temporal proximity as inadequate evidence of scienter

██ Plaintiffs claim that the fact that the January 8, 2002 press release was issued just three weeks before Metawave announced the change in its revenue recognition policy, and that the GSM product line was canceled two months later, casts doubt on the truth of the January 8, 2002 press release. However, the press release of January 29, 2002 announcing the change in Metawave's revenue recognition policy did not mean that Defendants knew that prior statements about revenue were false at the time they were made. Temporal proximity between a company's last favorable statements and bad news can bolster a complaint; however, temporal proximity, without more, is insufficient to meet the pleading requirements of the PSLRA. *Ronconi,* 253 F.3d at 437; *Yourish,* 191 F.3d at 997.

Individually and collectively, Metawave's restatement of revenue, the existence of side letters, the violations of GAAP, the statements of confidential witnesses, and the temporal proximity of the restatement to previous press releases are not sufficient to plead Defendants Hunsberger and Fuhlendorf's scienter as to Metawave's statements concerning revenue recognition. These bases for Plaintiffs' allegations may support an inference of scienter, but not a strong inference of scienter.

4. *Allegations of inflated inventory balances*

██ Plaintiffs allege that Defendants made false statements by improperly reporting Metawave's inventory balance in the Form 10–Q SEC filing for the first quarter of 2001. CCAC ¶ 62. Plaintiffs allege that Metawave falsely reported that it had inventory on hand of $12.2 million, which included $3.7 million of obsolete and nonsaleable inventory, and at least $3 million of nonexistent inventory. *Id.* ¶¶ 62, 82.

Plaintiffs allege that during the fourth quarter of 2000, an inventory obsolescence reserve of $3.7 million existed for component parts that had been deemed nonsaleable. *Id.* ¶ 83. Plaintiffs allege that at the

end of 2000, the reserve was reversed on the grounds that the goods had become saleable. Plaintiffs contend that the real reason for the reversal was to "help Metawave make its year-end numbers." *Id.* Plaintiffs claim that none of this inventory was sold during the first quarter of 2001 and at the end of the quarter, Defendants failed to re-establish the reserve for obsolete component parts. *Id.*

Plaintiffs allege that a physical inventory conducted in connection with the 2000 audit, and subsequent analyses of Metawave's recorded inventory balances, revealed at least $3 million of nonexistent inventory. *Id.* ¶ 84. Plaintiffs assert that $1.2 million of the nonexistent inventory was "inventory on loan," which consisted of spares and kit parts that Metawave's service technicians carried with them in the field. *Id.* Plaintiffs claim that problem parts were to be replaced with a new part from the "inventory on loan," and the problem parts were to be returned to inventory for subsequent repairs or disposition, but no parts ever came back. *Id.* Thus, Plaintiffs allege that Metawave's inventory balance contained an entry for $1.2 million in inventory that did not exist. *Id.* Plaintiffs further assert that the nonexistent inventory included at least $700,000 in stock inventory that was supposedly "locked in a secure room" at Metawave's headquarters. *Id.* However, Plaintiffs claim that most of this inventory could not be found when a physical inventory was conducted. *Id.*

### a. Logical inferences

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' claims regarding allegedly obsolescent and nonexistent inventory fail to establish fraudulent activity. Defendants Hunsberger and Fuhlendorf contend that the most logical explanation for the obsolescent inventory is that the inventory was sold in the fourth quarter of 2000, and consistent with GAAP, Metawave reversed the related reserve in that period as well. Plaintiffs disagree with Metawave's contention that the inventory related to the $3.7 million reserve was sold in the fourth quarter of 2000.

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs' allegations of nonexistent inventory make no sense because Plaintiffs acknowledge in the CCAC that $130,000 of the "nonexistent" inventory was eventually found. *Id.* Plaintiffs assert that this inventory did not exist and was improperly recorded.

There is a factual dispute concerning whether the inventory related to the $3.7 million inventory obsolescence reserve was sold in the fourth quarter of 2000. As for the nonexistent inventory, even though $130,000 of the inventory was found, Defendants Hunsberger and Fuhlendorf offer no explanation for the remaining amount of allegedly nonexistent inventory. For purposes of determining whether Plaintiffs have sufficiently alleged falsity on a motion to dismiss, the Court must assume that Plaintiffs' version of the facts is correct. The Court cannot grant Defendants Hunsberger and Fuhlendorf's motion to dismiss merely on the ground that Plaintiffs' claims are not founded on logical inferences.

### b. Confidential witness

Plaintiffs rely heavily on CW1, Metawave's senior cost accountant in charge of inventory accounting, as the basis for their allegations regarding improper inventory accounting. CW1 asserts that Defendants Hunsberger and Fuhlendorf knew about the inventory problems. CW1 states that at the end of 2000, he was instructed by Metawave's Controller, who reported directly to Defendant Fuhlendorf, to reverse the $3.7 million reserve for obsolete parts

on the grounds that the goods had suddenly become saleable. *Id.* ¶ 83. CW1 states that Defendants knew the reserve had been reversed to "help Metawave make its year-end numbers." *Id.* CW1 states that he spent "hours behind closed doors" with Defendants Hunsberger and Fuhlendorf explaining the inventory accounting problems, but that Hunsberger and Fuhlendorf overlooked or disregarded the errors to achieve desired financial results. *Id.* ¶ 88.

Because of his position and responsibilities, CW1 would be expected to have knowledge concerning the inventory accounting. However, the fact that Metawave's Controller told CW1 to reverse the reserve does not establish that Defendant Fuhlendorf knew the reserve was necessary. CW1's statement that Defendants Hunsberger and Fuhlendorf knew the reserve had been reversed to "help Metawave make its year-end numbers" is unsupported by any details concerning how CW1 had knowledge of what Hunsberger and Fuhlendorf knew. CW1's statement concerning "hours behind closed doors" with Defendants Hunsberger and Fuhlendorf provides stronger evidence of Defendants' knowledge, but the CCAC contains no details regarding when these closed door meetings took place or what was specifically discussed. Thus, Plaintiffs have not shown that Defendants Hunsberger and Fuhlendorf knew that Metawave's inventory accounting was false when reported. The Court concludes that Plaintiffs' reliance on CW1 alone does not support a strong inference of scienter.

c. Circumstantial evidence

In addition, Plaintiffs claim there is circumstantial evidence of scienter because Defendants attempted to engage in other manipulations of inventory balances to improve the company's financial results. *Id.* ¶¶ 87–88. CW1 states that he was "fre-quently told by the accounting department what [his] numbers needed to be prior to publication and release of financial statements." *Id.* ¶ 88. CW1 also states that he issued monthly "Inventory Analysis Reports" to upper management that itemized inventory balances and discussed changes and accounting adjustments. *Id.* ¶ 89. CW1 states that he also drafted several "Problem Statements" during the Class Period that raised red flags concerning problematic inventory accounting. CW1 further states that Defendants received monthly "Redbooks" prior to the filing of any Metawave financial statement. *Id.* CW1 states that Defendants repeatedly directed accounting adjustments between the time the Redbooks were distributed and SEC filings were issued to generate favorable financial results. *Id.* CW1 also states that Defendants established reserve accounts as "slush funds" that could be adjusted to create favorable financial results. *Id.* ¶ 90. Plaintiffs argue that Metawave's attempts to manipulate the numbers supports the inference that Defendants knew that Metawave's reported financial results were false when issued.

Plaintiffs fail to provide adequate details about CW1's statement that he was told what his numbers needed to be. CW1 did not state who told him what his numbers needed to be CW1's statements are not sufficiently detailed regarding the concerns raised about improper accounting and what internal documentation he presented to Hunsberger and Fuhlendorf. Regarding the slush funds, Plaintiffs fail to allege which Defendants were involved, when any slush fund was created or used, what the slush fund consisted of, or for what purpose a slush fund would be used. Therefore, the Court concludes that Plaintiffs' circumstantial evidence regarding concerns raised about improper accounting, manipulation of numbers, and slush

funds are not sufficiently detailed to establish a strong inference of scienter concerning the improper inventory accounting.

### d. Independent auditors

Defendants Hunsberger and Fuhlendorf rely on the fact that Metawave's independent auditors signed off on Metawave's year-end financial statements without raising issues of non-existent inventory. RJN 1:89, 2:133. Thus, Defendants Hunsberger and Fuhlendorf argue that Metawave's inventory accounting decisions were simply a matter of accounting judgment.

Plaintiffs argue that Defendants failed to provide the auditors with sufficient information to audit inventory balances, which precludes Defendants from taking cover under its auditors' opinions. CW1 states that based on his conversations with Ernst & Young auditors, he believed that Ernst & Young resigned as Metawave's auditor in January 2001 in part because of Metawave's inability to track inventory or provide accurate information regarding inventory balances. CCAC ¶ 54. In April 22, 2002, Metawave also announced that Arthur Andersen was resigning as auditor, partly because of deficient internal control procedures related to tracking and managing inventory balances and recording costs of inventory. RJN 6:221.

Defendants Hunsberger and Fuhlendorf may not hide behind its auditors' opinions if Metawave provided insufficient information to the auditors. Although CW1's beliefs as to why Ernst & Young resigned are based on hearsay, Metawave's own disclosures in its April 22, 2002 Form 8–K SEC filing indicate that Arthur Andersen had raised the issue of deficiencies in Metawave's internal controls procedures. *Id.* However, these facts do not establish that Defendants Hunsberger and Fuhlendorf knew that Metawave's inventory accounting was false when reported. The April 22, 2002 disclosures occurred after the Class Period and do not indicate that Hunsberger and Fuhlendorf knew that the inventory balance reported in the Form 10–Q SEC filing for the first quarter of 2001 was false at the time.

Plaintiffs' reliance on CW1 and other circumstantial evidence may support an inference of scienter concerning Metawave's inventory accounting, but not a strong inference of scienter. Accordingly, the Court dismisses Plaintiffs' claims against Hunsberger and Fuhlendorf for false or misleading statements concerning inventory accounting.

### E. Exceptions

#### 1. *Safe Harbor*

Defendants Hunsberger and Fuhlendorf argue that the Court should dismiss all allegations based on Metawave's statements during the Class Period that relate to demand because Metawave's statements about demand were forward-looking. The PSLRA provides that forward-looking statements are protected under the "safe harbor" provisions of the 1934 Act. 15 U.S.C. § 78u–5(c)(1)(A)(i). The PSLRA provides that a person shall not be liable for any "forward-looking statement" that is "identified" as such, and is "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* A "forward-looking statement" is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions "underlying or related to" any of these issues. *Id.* § 78u–5(i). The PSLRA also provides that even if no cautionary statement accompanies the forward-looking statement, liability cannot attach unless the plaintiff shows that the defendant

made the statement with "actual knowledge ... that the statement was false or misleading." *Id.* § 78u–5(c)(1)(B).

Because the Court finds that Plaintiffs have not sufficiently pled that the Individual Defendants knew that the statements about GSM demand were false or misleading when made, as discussed above in this Order, the Court need not reach the issue of whether the safe harbor provisions apply. Nonetheless, the Court notes that most of the allegedly false or misleading statements concerning demand for the GSM product in the press releases are not forward-looking statements. The Court finds that any statements regarding GSM demand in the press releases of April 24, 2001, May 29, 2001; October 2, 2001, October 23, 2001, January 8, 2002; and January 29, 2002, did not project future demand, or relate to any forward-looking statement. RJN 9:249, 11:252, 13:257, 14:259, 15:263, 16:265. The Court finds that only the May 15, 2001 and July 24, 2001 press releases contain forward-looking statements concerning demand for the GSM product.[14] RJN 10:251, 12:253. These press releases discussed existing demand at the time of the statements, and based projections of favorable results for the rest of 2001 on that demand. Thus, these statements regarding demand are forward-looking statements because they are "assumptions underlying or relating to" a financial projection or future economic performance.

Regardless of whether Defendants' statements in the May 15, 2001 and July 24, 2001 press releases contained the required safe harbor cautionary language,[15]

14. Metawave stated in the May 15, 2001 press release that "we've been seeing increased demand for our SpotLight GSM product in the Asian market ... [G]iven this demand, we anticipate that we will make up this shortfall during the third and fourth quarters of this year." RJN 10:251. The July 24, 2001 press release stated that GSM orders during the second quarter of 2001 indicated "increasing demand" for the GSM product, and that "[b]ecause of this, we anticipate improved results in the second half of the year." RJN 12:253.

15. Metawave's press releases contained cautionary language similar to the following.

Except for the historical information presented, the matters discussed in this press release may contain forward-looking statements relating to the future sale of Metawave's products and services and future operating results, as well as other future events, circumstances, trends, plans and prospects and are subject to certain risks and uncertainties that could cause actual results to differ materially from any future results, performance or achievements expressed or implied by such statements. These are forward looking statements for purposes of the safe harbor provisions under the Private Securities Litigation Reform Act of 1995. Factors which could cause results or events to differ from current expectations include, among other things our ability to source needed components for our GSM products from suppliers on an expedited basis; our ability to establish new manufacturing capabilities on an expedited basis; dependence on a limited number of wireless network operators for substantially all of our revenue, reliance on a single exclusive outsourced manufacturer of our antenna systems, delays in installation of our products which could cause delays in payment and revenue recognition; sales in international markets; and the slowdown in capital spending of the wireless network operators who are our customers. For additional information on these and other factors which could affect Metawave's operating and financial results, *see the reports filed by Metawave with the United States Securities and Exchange Commission.*

*See, e.g.,* RJN 10:251. Mere boilerplate cautionary language is insufficient. *In re Clorox Co. Sec. Litig.,* 238 F.Supp.2d 1139, 1142 (N.D.Cal.2002), H.R. CONF. REP. No. 104–369, at 43–44 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 742–43. In analyzing whether a statement is a meaningful cautionary statement, courts should consider whether the cautionary language conveys substantive information about factors that re-

liability cannot attach unless the "forward-looking statement" was made with "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(B). As discussed above in this Order, Plaintiffs have failed to sufficiently plead that Defendants Hunsberger and Fuhlendorf knew that the statements concerning demand were false at the time they were made. Therefore, liability cannot attach to the "forward-looking" press release statements made on May 15, 2001 and July 24, 2001.[16]

### 2. Puffery

Because the Court finds that Plaintiffs have not sufficiently alleged that Defendants Hunsberger and Fuhlendorf knew that the statements about GSM demand were false or misleading when made, the Court need not address Defendants Hunsberger and Fuhlendorf's argument concerning immaterial puffery, which was raised in a footnote. Nonetheless, the Court has reviewed these statements. To determine whether a statement is mere puffery, the Court must examine whether a statement is so "exaggerated" or "vague" that no reasonable investor would rely on the statement when considering the total mix of available information *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200–01 (3d Cir.1990); *In re Splash Tech.*

*Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1076 (N.D.Cal.2001). The statements about GSM demand did not merely exaggerate the amount of demand, but represented that there actually *was* demand when the GSM product was not functional. The statements could be relied upon by a reasonable investor. The drop in stock price when Metawave disclosed the insufficient demand for the GSM product, its decision to terminate the GSM product line, and restate its earnings for the first and third quarters of 2001 demonstrate that the statements were not mere puffery.

### F. Control Person Liability

Defendants Hunsberger and Fuhlendorf argue that Plaintiffs fail to show that the Individual Defendants are each a control person of the others under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).[17] To show control person liability, a plaintiff must show. (1) "a primary violation of federal securities law," and (2) "that the defendant exercised actual power or control over the primary violator." *America West*, 320 F.3d at 945 (quoting *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000)). Hunsberger and Fuhlendorf contend that because Plaintiffs have failed to plead a securities claim in violation of

---

alistically could cause results to differ materially from those projected in the forward-looking statement, such as information about the issuer's business. H.R. CONF. REP. No. 104–369, at 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. at 742. The Court notes that Metawave's cautionary statements were not boilerplate because the cautionary language accompanying each press release was not always identical, and listed factors particular to Metawave's business. *See* RJN 9:249–50, 10:251, 12:253–54, 13:258, 14:260, 15:264, 16:266. The Court need not decide whether Metawave's cautionary language was adequate at this time because the Court did not

find that Plaintiffs sufficiently pled Defendants Hunsberger and Fuhlendorf's actual knowledge that the statements about demand were false or misleading.

**16.** Because the Court finds that safe harbor protection applies to the two forward-looking statements, the Court need not analyze whether the "bespeaks caution" doctrine would also apply.

**17.** This is a second cause of action that is separate from Plaintiffs' cause of action for violations of Section 10(b) of the 1934 Act and Rule 10b–5.

Section 10(b) or Rule 10b–5, the "control person" allegations must be dismissed.

As a threshold matter, Plaintiffs respond that they have pled a primary violation of Section 10(b). Plaintiffs argue that Defendants Hunsberger and Fuhlendorf were control persons because Hunsberger and Fuhlendorf held the highest offices at Metawave. During the Class Period, Hunsberger was the Chairman and CEO, and Fuhlendorf was the CFO. CCAC ¶¶ 27–28. Plaintiffs argue that they sufficiently pled specific conduct because Hunsberger issued press releases, acted as a Metawave spokesman, signed Metawave's financial statements, directed accounting adjustments, and had control over Liang. Plaintiffs argue that Fuhlendorf was responsible for financial reporting and ordered accounting adjustments.

 Determining who is a controlling person is usually an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard,* 228 F.3d at 1065 (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir.1994)), *Cylink,* 178 F.Supp.2d at 1089. At the motion to dismiss stage, general allegations concerning an individual defendant's title and responsibilities are sufficient to establish control. *In re Adaptive Broadband Sec. Litig.,* No. 01–1092, 2002 WL 989478, at *18, 2002 U.S. Dist. LEXIS 5887, at *58–59 (N.D.Cal. Apr. 2, 2002), *Cylink,* 178 F.Supp.2d at 1089, *Marks v. Simulation Sciences,* No. 98–546, 2000 WL 33115589, at *4, 2000 U.S. Dist. LEXIS 4536, at *13–14 (C.D.Cal. Feb. 28, 2000). Thus, Plaintiffs have sufficiently pled that Defendants Hunsberger and Fuhlendorf exercised actual power or control over any primary violators based on their positions as CEO and CFO. However, Plaintiffs have not adequately pled a primary viola-

tion of Section 10(b). Therefore, the Court will dismiss Plaintiffs' Section 20(a) claims against Defendants Hunsberger and Fuhlendorf, without prejudice.

## II. Defendant Liang's Motion to Dismiss

Defendant Liang raises certain of the arguments that Defendants Hunsberger and Fuhlendorf raise in their motion to dismiss, such as those regarding confidential witnesses, fraud by hindsight, lack of motive, and lack of scienter. Liang also asserts additional arguments that have particular applicability to him.

### A. Group Pleading Doctrine

 Defendant Liang moves to dismiss on the ground that he cannot be included with the other individual defendants who allegedly made false or misleading statements because the "group pleading" doctrine does not apply. The "group pleading" doctrine applies when a group of people has published or released a corporate statement, such as an annual report, press release, or other "group-published information." *Wool v. Tandem Computers Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987). Plaintiffs must allege that a defendant who was a company officer was not only involved in the day-to-day activities of the corporation, but also directly involved in the preparation of the public statement. *Copperstone v. TCSI Corp.,* No. 97–3495, 1999 WL 33295869, at *16, 1999 U.S. Dist. LEXIS 20978, at *54 (N.D.Cal. Jan. 19, 1999); *In re Oak Tech. Sec. Litig.,* No. 96–20552, 1997 WL 448168, at *11, 1997 U.S. Dist. LEXIS 18503, at *32–33 (N.D.Cal. Aug. 1, 1997).

Defendant Liang argues that Plaintiffs have not specifically described his role in the challenged group statements with the required degree of particularity. Liang argues that his position or title is not a

sufficient basis to presume that he was actually involved in making the challenged statements in the SEC filings, press releases, or conversations with analysts. Liang contends that none of his job functions included responsibility for financial reporting, accounting, investor relations, or communications with analysts or the investing public.

Plaintiffs respond that Liang is liable under the group pleading doctrine because he was a "hands-on" manager with respect to all GSM-related matters, and the alleged misleading statements related directly to his area of responsibility. Pls.' Opp., docket no. 43, at 61. Plaintiffs claim they need not show that Liang was directly involved in preparing the challenged statements because the group-published presumption is reasonable. Plaintiffs contend that the allegedly false or misleading statements could not have been prepared without Liang's input because each of the statements involves, to some extent, a representation of the demand for the GSM product and revenues from its sales.

The CCAC generally alleges that each of the Individual Defendants "directly participated in the management of the Company, was directly involved in the day to day operations of the company at the highest levels and was privy to confidential proprietary information." CCAC ¶ 193. The CCAC also generally alleges that the Individual. Defendants "participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature." Id. ¶ 195. However, the CCAC does not specifically allege that Liang was directly involved in the SEC filings, press releases, or conver-sations with analysts, other than the January 8, 2002 press release. The CCAC does not allege that Liang's position as a sales executive involved revenue recognition or preparation of financial statements. The CCAC does not specifically allege that Liang was involved in the day to day operations of Metawave in his position as a sales executive, even if he were a "hands-on" manager. Nor do Plaintiffs allege that Liang had a duty to discover and disclose facts to correct a public misstatement or omission of senior executives. The court in *Cylink* dismissed similar allegations brought against a vice president of sales and marketing for failure to state a claim. *Cylink*, 178 F.Supp.2d at 1084–85. Even if Liang provided information to Hunsberger and Fuhlendorf regarding international sales, development of the GSM product, and negotiations with distributors, Plaintiffs fail to show that Liang could be liable under the group pleading doctrine for any of the allegedly false or misleading financial statements, except for the allegations relating to the January 8, 2002 press release that quotes Liang.

Moreover, Liang cannot be held liable under the group pleading doctrine for statements to analysts that resulted in the analysts' reports because oral statements are not "group-published." *In re Splash Tech. Holdings, Inc. Sec. Litig.*, No. 99–109, 2000 WL 1727405, at *13, 2000 U.S. Dist. LEXIS 15370, at *45 (N.D.Cal. Sept. 29, 2000); *Schlagel v. Learning Tree Int'l*, No. 98–6384, 1998 WL 1144581, at *4, 1998 U.S. Dist. LEXIS 20306, at *14–15 (C.D.Cal. Dec. 23, 1998). Analyst reports are not considered to be the work of a group unless they are based on group-published information. *In re Gupta Corp. Sec. Litig.*, 900 F.Supp. 1217, 1240 (N.D.Cal.1994). The CCAC does not allege that the analyst reports were based on group-published information. The CCAC does not allege that Liang spoke to

any analyst, that he prepared others to speak to analysts, or that he was involved in any communications with analysts. Thus, Plaintiffs have failed to state a claim as to Liang's liability for statements made in Metawave's SEC filings, press releases, or conversations with analysts.

## B. Falsity and Scienter as to Liang's Statements in the January 8, 2002 Press Release

### 1. Falsity

Defendant Liang argues that Plaintiffs' allegations regarding the January 8, 2002 press release do not allege specific facts that show that the statements Liang made were false, or that Liang made the statements with adequate scienter. The January 8, 2002 press release quotes Liang as saying, "Our smart antennas are ideal solutions for operators like Guangzhou Unicom who face challenges from the high interference conditions symptomatic of dense urban GSM networks," and "SpotLight GSM helps operators protect their infrastructure investment because it provides them with solutions to network capacity and optimization challenges and allows them to operate more efficiently as they grow their networks." RJN 15.263. Liang's quotation in the January 8, 2002 press release describes the benefit of the GSM product in densely populated areas, without addressing sales, demand, or the results of lab or field tests. The statements attributed to Liang are unrelated to Plaintiffs' reasons for the falsity of the press release, which were that there was no demand for the SpotLight GSM product and that the SpotLight GSM product never worked. See In re Autodesk, Inc. Sec. Litig., 132 F.Supp.2d 833, 840–42 (N.D.Cal.2000) (noting deficiencies in a complaint that failed to set forth why particular statements were false or misleading). Liang's statements in the January 8, 2002 press release did not affirmatively speak to the issues of demand for the GSM product or the results of lab and field tests. Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir.2002). The Court concludes that Plaintiffs have not sufficiently pled falsity as to Liang's statements in the January 8, 2002 press release.

### 2. Scienter

Plaintiffs argue that they sufficiently pled Liang's knowledge of the falsity of the statements in the January 8, 2002 press release. Plaintiffs rely on confidential witnesses, and on Liang's position as a sales executive in charge of international sales. Plaintiffs rely on CW7, a former Metawave Systems Test Engineer, who states that he believed that the practice of shipping out products that had failed performance trials was ordered by Metawave executives, including Liang, in an attempt to demonstrate a positive response from customers. CCAC ¶ 67. CW6, Senior Program Manager for GSM operations, states that he or she attended Program Review Meetings with Liang at which the development, distribution, inventory, deployments, and technical issues concerning the GSM product "were discussed." Id. ¶ 75. CW4, a project manager who worked on developing the GSM system, states that at several Program Review Meetings during the third quarter of 2001 and fourth quarter of 2001, he expressed "concerns" that there was no proven demand for Metawave's GSM product in China. Id. ¶ 135. CW4 stated that Defendant Liang dismissed these concerns and insisted that Metawave proceed with its plans to develop and build the GSM products. Id. CW9, a Metawave Software Engineer assigned to the GSM product, states that in "early January 2002," at a weekly "GSM update meeting," Liang acknowledged to GSM staff that

Metawave's GSM products were not viable and that "our customers don't seem to want our system."[18] *Id.* ¶ 143.

Plaintiffs fail to adequately plead that Liang knew that Metawave's statements were false. The CCAC does not establish how CW7 had knowledge of what Liang knew about failed GSM performance trials, or how CW7 knew of Liang's motive for ordering GSM products to be shipped. CW6's statements about Program Review Meetings do not indicate with particularity what was discussed, when the meetings took place, or whether Liang attended all the meetings. CW4's concerns about lack of demand for the GSM product in China could have been his own opinions with which Liang reasonably disagreed, which does not lead to a strong inference of deliberate recklessness. The statements allegedly made by Liang at the "GSM update meeting" in early January 2002, do not show what Liang knew at the time of the January 8, 2002 press release. Therefore, CW9's testimony fails to establish a strong inference of deliberate recklessness. Plaintiffs' reliance on Liang's position and responsibilities at Metawave are insufficient to support a strong inference of Liang's scienter.

### C. Puffery

In the alternative, Liang's statements in the January 8, 2002 press release regarding the GSM product are, at most, immaterial puffery which is not actionable. *Parnes v. Gateway 2000, Inc.,* 122 F.3d 539, 547 (8th Cir.1997); *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119–20 (10th Cir.1997); *Splash,* 160 F.Supp.2d at 1076–77, *In re Syntex Corp. Sec. Litig.,* 855 F.Supp. 1086, 1096 (N.D.Cal.1994), *aff'd,* 95 F.3d 922 (9th Cir.1996). To de-

termine whether a statement is mere puffery, the Court must examine whether a statement is so "exaggerated" or "vague" that no reasonable investor would rely on the statement when considering the total mix of available information. *Hoxworth,* 903 F.2d at 200–01, *Splash,* 160 F.Supp.2d at 1076. In *Splash,* the court held that statements describing "strong" demand, "better than expected" or "robust" results, a growth strategy that "was unfolding as planned," a "well positioned" company, a "solid" company position, and an "improved" product line were nonactionable puffery. 160 F.Supp.2d at 1076–77.

Plaintiffs did not address this argument in their opposition. The Court interprets Plaintiffs' failure to address this issue as a concession that this argument constitutes a valid reason for dismissal of the CCAC, or at least portions of the CCAC relating to Liang. *Splash,* 160 F.Supp.2d at 1071 n. 7, *Koehler v. Bank of Bermuda (New York) Ltd.,* No. 96–7885, 1998 WL 67652, at *7, 1998 U.S. Dist. LEXIS 1766, at *24 (S.D.N.Y. Feb. 19, 1998), *FTC v. Silueta Distribs, Inc.,* No. 93–4141, 1995 WL 215313, at *8 n. 5, 1995 U.S. Dist. LEXIS 22254, at *12 n. 5 (N.D.Cal. Feb. 24, 1995); *Cimpi v. Dole,* 739 F.Supp. 25, 27–28 (D.D.C.1990); *cf.* CR 7(b)(2) (stating that the failure of a party to file papers in opposition to a motion "may be considered by the court as an admission that the motion has merit").

On the merits, the statements attributed to Liang in the January 8, 2002 press release are mere puffery. Liang described Metawave's smart antennas as "ideal solutions." RJN 15:263. Liang stated that SpotLight GSM helped operators "protect" their infrastructure investment and "operate more efficiently." *Id.*

---

18. The Court notes that none of the statements allegedly made by Liang in paragraphs 135 and 143 of the CCAC could be the basis of liability under Section 10(b) of the 1934 Act or Rule 10b–5 because they were not disclosed to the public.

These statements are vague and opinions that a reasonable investor would not rely on in making investment decisions. Liang's descriptions of the GSM product are similar to the hyperbolic statements in *Splash*, 160 F.Supp.2d at 1076–77.

## D. Control Person Liability

Plaintiffs' Section 20(a) claim must be dismissed because Plaintiffs fail to allege an underlying Section 10(b) violation. In the alternative, Plaintiffs do not allege facts showing that Liang is a control person.[19] Plaintiffs contend that Liang oversaw the specific misconduct at issue regarding sales of GSM products in Asia because he was a sales executive responsible for international sales during the Class Period. CCAC ¶ 29. Plaintiffs allege that Liang reported directly to Hunsberger and Fuhlendorf about efforts to expand international sales. *Id.* ¶ 46. Determining who is a controlling person is usually an "intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Howard*, 228 F.3d at 1065 (quoting *Kaplan*, 49 F.3d at 1382); *Cylink*, 178 F.Supp.2d at 1089. At the motion to dismiss stage, general allegations concerning an individual defendant's title and responsibilities are sufficient to establish control. *Adaptive Broadband*, 2002 WL 989478, at *18, 2002 U.S. Dist. LEXIS 5887, at *58–59; *Cylink*, 178 F.Supp.2d at 1089, *Marks*, 2000 WL 33115589, at *4, 2000 U.S. Dist. LEXIS 4536, at *13–14. However, Liang's titles of President of World Trade and Vice President for Worldwide operations do not establish that Liang had control. The CCAC does not allege that Liang was involved in the day-to-day affairs of Metawave, or that Liang's position involved rev-

enue recognition, inventory accounting, or the issuance of Metawave's financial statements-just that Liang tried to expand international sales. Indeed, the CCAC shows that Liang was a subordinate because he reported directly to Hunsberger and Fuhlendorf about international sales. CCAC ¶ 46. Thus, the Court concludes that Plaintiffs have not sufficiently pled that Liang was a control person who could be liable under Section 20(a).

For the reasons stated in this Order, the Court GRANTS Defendant Liang's motion to dismiss Plaintiffs' claims under Section 10(b) and Rule 10b–5 relating to false and misleading statements regarding GSM demand, revenue recognition, and inventory accounting. The Court also dismisses Plaintiffs' Section 20(a) claims against Liang.

## III. Dismissal With or Without Leave to Amend

In most cases, the Court should freely grant leave to amend when a viable case may be presented. FED. R. CIV. P. 15(a). When the allegations in a securities fraud complaint are inadequate to establish a strong inference of deliberate recklessness, dismissal with leave to amend is the most prudent course of action, unless it is clear that the pleading could not be saved by amendment. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052–53 (9th Cir.2003). In *Lipton*, the court determined that the plaintiffs could not cure the deficiencies in their complaint when the plaintiffs had six months between the filing of the original lawsuit and the filing of the consolidated amended complaint, and an additional three months before the district court's hearing on the motion to dismiss, in which they could have amended their complaint. 284 F.3d

19. Plaintiffs' Section 20(a) claim is a second cause of action that is separate from Plain-tiffs' cause of action for violations of Section 10(b) of the 1934 Act and Rule 10b–5.

at 1038–39. The *Lipton* court stated that any amendment would be futile, and affirmed the dismissal of the complaint with prejudice. *Id.* Similarly, in *Silicon Graphics,* the court dismissed with prejudice when it found that a plaintiff had failed to set forth any facts that could be added to save the complaint. 183 F.3d at 991.

Plaintiffs had almost six months between the filing of the original lawsuit and the filing of the consolidated class action complaint, and almost six months before Defendants' motions to dismiss became ripe for review, in which they could have corrected deficiencies in their complaint. Plaintiffs have not set forth any facts as to Defendant Liang that would show that amendment of Plaintiffs' Section 20(a) claim would not be futile. The basic facts as alleged against Defendant Liang may give rise to an amendment of Plaintiffs' Section 10(b) and Rule 10b–5 claims that would not be futile. The basic facts as alleged against Defendants Hunsberger and Fuhlendorf may give rise to an amendment of Plaintiffs' Section 10(b), Rule 10b–5, and Section 20(a) claims that would not be futile. Accordingly, the Court dismisses without leave to amend Plaintiffs' Section 20(a) claim against Defendant Liang. The Court dismisses with leave to amend Plaintiffs' Section 10(b) and Rule 10b–5 claims against Defendant Liang. The Court dismisses with leave to amend all claims against Defendants Hunsberger and Fuhlendorf.

*CONCLUSION*

For the forgoing reasons, the Court rules as follows:

(1) The Court GRANTS Defendants Hunsberger and Fuhlendorf's motion to dismiss Plaintiffs' consolidated complaint, docket no. 34. The Court DISMISSES WITH LEAVE TO AMEND Plaintiffs' Section 10(b), Rule 10b–5, and Section 20(a) claims against Hunsberger and Fuhlendorf for false and misleading statements regarding lack of demand for the GSM product, revenue recognition, and accounting of inventory. Any amended complaint against these Defendants must be filed by August 15, 2003.

(2) The Court GRANTS Defendant Liang's motion to dismiss consolidated complaint, docket no. 37. The Court DISMISSES WITH PREJUDICE Plaintiffs' Section 20(a) claim against Defendant Liang. The Court DISMISSES WITH LEAVE TO AMEND Plaintiffs' Section 10(b) and Rule 10b–5 claims against Liang for false and misleading statements regarding lack of demand for the GSM product, revenue recognition, and accounting of inventory. Any amended complaint against Defendant Liang must be filed by August 15, 2003.

IT IS SO ORDERED.